**SIERRA CLUB, Plaintiff,**

v.

**James D. WATKINS, Secretary, U.S. Department of Energy, et al., Defendants.**

**Civ. A. No. 88–3519 (RCL).**

United States District Court, District of Columbia.

Dec. 9, 1991.

John Charles Cleary, U.S. Attorney's Office, Washington, DC, for defendants.

Ronald J. Wilson, Sierra Club Legal Defense Fund, Washington, DC, for plaintiff.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on the parties' cross-motions for summary judgment. The plaintiff Sierra Club seeks to enjoin the Department of Energy ("the Department") from shipping spent nuclear fuel rods from Taiwan through the port of Hampton Roads, Virginia until the Department files an environmental impact statement ("EIS") or cures an allegedly inadequate environmental assessment ("EA")[1]

---

1. As explained below, the environmental assessment at issue in this case was completed in June of 1991 and refers to the shipment of 118 spent fuel rods. *See* Environmental Assessment of the Risks of the Taiwan Research Reactor Spent Fuel Project, U.S. Dep't of Energy DOE/EA–0515 (June 1991) [hereinafter "1991 EA"]. The plaintiff's challenges to the earlier environmental assessment involving the shipment of 1100 spent fuel rods from Taiwan are now moot

which found that shipping the fuel rods would have "no significant impact" on the environment. The Department asks this court to defer to its finding of no significant impact ("FONSI") and uphold the adequacy of the 1991 EA. For the reasons stated below, both parties' motions for summary judgment shall be GRANTED in part and DENIED in part.

## I. Facts

The United States has exported nuclear fuel for foreign research reactors since the mid–1950's. See Letter from J. Dexter Peach, Director, General Accounting Office, to Honorable Richard L. Ottinger, Chairman, Subcommittee on Energy Conservation and Power, at 3 (Dec 13, 1984) [hereinafter "GAO Letter"]. Foreign nations who enter into a formal agreement with the United States for nuclear cooperation may return this fuel (after it has been used) to the United States for reprocessing and disposal. See id. By the authority of the Atomic Energy Act, as amended by the Non–Proliferation Act, 42 U.S.C. § 2160 (1988), the United States government, through the Department of Energy and its antecedents, established the "off-site fuels policy"[2] to accept spent nuclear fuel from foreign nations if the nuclear fuel was either produced or enriched in the United States. Since the advent of this off-site fuels policy in 1968, see Denny Decl. at ¶ 3, approximately 339 shipments of spent nuclear fuel from fourteen foreign nations have been transported into the United States without any accidents. See 1988 EA app. II. The justification for this policy has always been one of non-proliferation; quite simply, the less nuclear material available outside the United States, the less likely it is that some of it will be used for non-peaceful purposes.

In 1985, The American Institute of Taiwan and the United States government agreed to transport from Taiwan to the United States spent natural uranium from reactor fuel. See 50 Fed.Reg. 55252 (1985). According to the Department, this arrangement was separate from the off-site fuels policy because the reactor fuel was of foreign origin, involved natural (not enriched) uranium, and was shipped under different administrative arrangements. The Department's original plan (then called the Fuel Movement Project) was to bring 474 spent fuel rods into the United States through a port on the Pacific Coast (Long Beach, CA) and then to transport them overland in trucks to a processing plant located on the Savannah River in South Carolina.[3] The fuel rods are transported in enormous containers, called "Type B casks" that are made of lead and steel and weigh approximately 50,000 pounds. The Pacific Coast was selected because of the "lower cost, excellent port facilities, and shorter total time in transit." Def.Resp. to Int. #15. The Department, however, neglected to prepare any sort of document concerning the environmental effect of its action, as required under NEPA.

Before the Department was able to transfer the spent fuel rods into the United States, the Northwest Inland Waters Coalition obtained an injunction in a federal district court in Washington state preventing the Department from importing the fuel rods until it had prepared an environmental impact statement. See Northwest Inland Waters Coalition v. United States Dep't of Energy, Case No. C86–132T (W.D.Wa. Sept. 30, 1986). On appeal, the Ninth Circuit ruled that an EIS, the most

---

because the shipments considered therein have been completed. Nonetheless, reference will often be made in this opinion to the 1988 environmental assessment. See Environmental Assessment on Shipment of Taiwanese Research Reactor Spent Nuclear Fuel (Phase II), U.S. Dep't of Energy DOE/EA–0363 (June 1988) [hereinafter "1988 EA"].

2. The off-site fuels policy has predominantly involved highly enriched uranium. This program expired on December 31, 1988 and is

currently being considered for renewal. 52 Fed.Reg. 49198 (1987). The Department continues to engage in a program to import low enriched uranium; this program does not expire until December 31, 1992. 51 Fed.Reg. 7487 (1986).

3. The Department maintains two processing facilities: the Savannah River site and a facility at the Idaho National Engineering Laboratory.

extensive form of environmental documentation, was not required as an initial matter, but that the Department must complete an environmental assessment, a shorter document that aids an agency in deciding if an EIS is necessary, on the effects of importing Taiwan spent fuel. *See Northwest Inland Waters Coalition v. United States Dep't of Energy*, 852 F.2d 572 (9th Cir.1988). While the appeal was pending, the Department prepared an EA which concluded that an East Coast port would be a safer place to bring the fuel rods into the United States for reprocessing at the Savannah River site. *See* Environmental Assessment on Shipment of Taiwanese Research Reactor Spent Nuclear Fuel, U.S. Dep't of Energy DOE/EA–0321 (Dec.1986). The Department cited "the need to ship expeditiously, the existence of an Environmental Assessment for the East Coast, the course of proceedings in the Inland Waters Coalition lawsuit, and other institutional problems," Def.Resp. to Int. # 15, as reasons for abandoning its original plan to ship through the West Coast. The Department shipped the 474 fuel rods safely under this agreement.

By a subsequent agreement, the Department agreed to accept 1100 more spent fuel rods from Taiwan. *See* 52 Fed.Reg. 42706 (1987). The Department prepared an environmental assessment on the effect of transporting the fuel rods to Hampton Roads, Virginia by sea and then to the Savannah River site by truck. *See* 1988 EA. On December 12, 1988, the Sierra Club filed this suit, seeking to force the Department to comply with the requirements of NEPA. The Sierra Club argued that an EIS was required or, in the alternative, that the 1988 EA was legally insufficient. On May 4, 1990, the Sierra Club moved for summary judgment and the Department subsequently opposed this motion and filed a cross-motion for summary judgment. The court declined to issue a preliminary injunction to stop a shipment at a December, 1990 hearing and the shipments under the 1988 EA were completed without incident. On June 19, 1991, the Department filed a new EA with the court for the shipment of 118 additional fuel rods from Taiwan; this new document mooted the Sierra Club's claims against the 1988 EA and forced the plaintiff to amend its complaint and its motion for summary judgment to argue that the Department has still failed to fulfill its obligations under NEPA, despite the improvements made in the 1991 EA.

## II. An Overview of the 1991 EA

The 1991 EA used a computer program, RADTRAN IV,[4] to compare the environmental risks of bringing the fuel rods through 1) Hampton Roads, VA, 2) a West or Gulf Coast port, 3) Charleston, SC, or 4) Wilmington, NC.[5] The EA also considered the alternative of taking no action at all. The "no-action" alternative was summarily rejected as contrary to national security interests. RADTRAN IV calculated the radiological risks incurred by handlers, port workers, and members of the general population sufficiently near the route taken by the fuel rods. RADTRAN IV used actual population densities for all areas along the overland routes, but assumed certain conservative values for such variables as local topography and weather conditions.[6]

All three of the environmental assessments focused on two types of risks—incident-free risk and accident risks.[7] Incident-free risk results as a consequence of radiation doses absorbed by people and the environment in the normal course of transportation. The ship's crew, handlers, and people near the transport route will almost certainly be exposed to some additional radiation. Accident risks involve a range of

4. The 1988 EA used an earlier version of the computer code called RADTRAN III.

5. The 1988 EA did not consider any East Coast ports other than the proposed choice, Hampton Roads.

6. The 1988 EA used bounded values for population density and contained few site-specific criteria.

7. The 1991 EA also includes an assessment of the non-radiological risks, such as fatalities due to traffic accidents, that do not involve the release of radiation.

potential accidents which might occur that would release more significant amounts of radiation. Unlike incident-free risks, which will accrue regardless of any event occurring throughout transport, accident risks are reduced by the probability that such an accident will occur. The Department considered only what it deemed to be "credible" risks and divided these risks into six categories. The total radiological risk is thus the sum of the incident-free risk when added to the product of the accident risks and their conditional probabilities. On the basis of these calculations, the Department determined in each of the EA's that there was no significant impact on the environment and it issued a Finding of No Significant Impact ("FONSI"). In accordance with this finding, the Department stated that preparation of an EIS was unnecessary. .

### III. The National Environmental Policy Act

In 1969, Congress passed the National Environmental Policy Act ("NEPA"), codified at 42 U.S.C. § 4321 *et seq.*, in order to insure that all agencies of the federal government consider the environmental effects of proposed actions. One of NEPA's primary purposes is to make certain "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989). In addition to providing crucial information to the decisionmaker, NEPA also "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.* This audience includes the President, who is responsible for the agency's policy, and Congress, which has authorized the agency's actions. *See Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 833 (D.C.Cir.1972). These decisionmakers need access to information concerning the environmental effects of the proposed program to decide whether they will support or over-

rule the agency's action; environmental documentation aids the President and Congress in deciding larger issues of policy that may include matters outside the scope of a single agency's discretion. The "larger audience" also includes the public; NEPA documentation "gives the public the assurance that the agency 'has indeed considered environmental concerns in its decisionmaking process,' *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983), and, perhaps more significantly, provides a springboard for public comment." *Robertson*, 490 U.S. at 349, 109 S.Ct. at 1845; *see also Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693, 697 (2d Cir. 1972) ("[NEPA] is, at the very least, 'an environmental full disclosure law,' for the agency decision makers and the general public.") (quoting *Environmental Defense Fund, Inc v. Corps of Engineers*, 325 F.Supp. 749, 759 (E.D.Ark.1971)).

The cornerstone of this law is § 102(2)(C), codified as 42 U.S.C. 4332(2)(C), which requires

in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed actions should it be implemented.

42 U.S.C. § 4332(2)(C) (1988)

Under this provision, a government agency must prepare an environmental impact statement ("EIS") whenever a proposed government action qualifies as a "major

Federal action significantly affecting the quality of the human environment." In addition, NEPA further sets forth an independent requirement that federal agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E) (1988).

NEPA also created the Council on Environmental Quality to aid the President in designing national policies. As part of its mandate, the CEQ promulgates regulations to promote compliance with the "action-forcing" requirements of NEPA § 102(2). *See* 40 C.F.R. § 1500.1 (1990). These regulations define the terms of NEPA and detail the responsibilities of federal agencies. In particular, the regulations require a federal agency proposing major federal action that does *not* have a significant effect on the environment to file a document called an "environmental assessment" ("EA") that explains how the agency reached that conclusion. *See id.* at 1508.13. An EA should be brief, but also should set out sufficient evidence for the Finding of No Significant Impact ("FONSI"). *See id.* at 1508.9(a)(1). In addition, the regulations include an independent requirement that agencies preparing an EA examine alternatives, as required by § 102(2)(E) of NEPA. *See id.* at 1508.9(b).

Primary responsibility for compliance with NEPA is committed to the agencies. *See Sierra Club v. United States Dep't of Transp.*, 753 F.2d 120, 126 (D.C.Cir.1985). NEPA is a procedural statute that mandates no substantive results; so long as an agency has taken a "hard look" at an action and has followed NEPA's procedures, its substantive decision will not be overturned by a court unless it is arbitrary, capricious, or an abuse of discretion.[8] *See Marsh v. Oregon Natu-*

*ral Resources Council*, 490 U.S. 360, 377, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989); 5 U.S.C. § 706 (1988). Under this standard, a "reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Marsh*, 490 U.S. at 378, 109 S.Ct. at 1861 (quoting *Citizens to Preserve Overton Park, Inc v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). Courts should generally defer to the expertise of the agency when assessing difficult questions regarding scientific and technical disputes. *See Sierra Club v. United States Dep't of Transp.*, 753 F.2d 120, 129 (D.C.Cir.1985); *Izaak Walton League of America v. Marsh*, 655 F.2d 346, 372 (D.C.Cir.1981), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 ("In particular, [courts] should not attempt to resolve conflicting scientific opinions.... So long as the agency's conclusions have a substantial basis in fact, the mandate of NEPA has been satisfied."). Nonetheless, the agency must comply with the statute's and the regulations' procedural requirements, such as preparing an EA or an EIS and considering alternatives, or else a court may require compliance. The procedural provisions of NEPA "are designed to see that all federal agencies do in fact exercise the substantive discretion given them. These provisions are not highly flexible. Indeed, they establish a strict standard of compliance." *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1112 (D.C.Cir.1971).

## IV. Disputed Issues of Fact

Although each side disputes numerous issues involving the weight of scientific evidence concerning the environmental risk

---

**8.** The D.C. Circuit has at times used a "rule of reason" in reviewing agency decisionmaking under NEPA. *See Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827 (D.C.Cir. 1972); *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C.Cir.1988). The Supreme Court in *Marsh* clearly held that the correct standard of review was "arbitrary and capricious," but questioned whether there was any pragmatic difference between "arbitrary and capricious" and "reasonableness." *See Marsh*, 490 U.S. at 377–78 n. 23, 109 S.Ct. at 1860–61 n. 23.

of the importation of Taiwan spent fuel, there are no disputed issues of material fact that prevent the court from disposing of this case on summary judgment. The parties are in agreement as to what events have occurred, and the crux of plaintiff's case is that the government has failed to disclose information (whether facts or theories) in its environmental assessment that might require the Department to file an environmental impact statement. Under NEPA, the dispute is over what facts or theories must be considered in a legally sufficient EA or what facts or controversies are sufficient to trigger the preparation of an EIS, not over which theories or facts are correct.

## V. Preparation of an EIS

The Sierra Club asks this court to enjoin the Department of Energy from importing Taiwan spent fuel rods until the Department files an environmental impact statement. The Sierra Club argues that an EIS is required for two unrelated purposes. First, plaintiff alleges that there are substantial and significant questions of scientific controversy that demand an EIS. Essentially, the Sierra Club argues that, regardless of the conclusions of the Department's experts, there is such significant doubt concerning the scientific data about the dangers of shipping spent nuclear fuel rods that an EIS is legally required. Second, the Sierra Club claims that the shipping of nuclear fuel rods from other countries is an on-going program sponsored by the United States government. As such, separate provisions of the Council on Environmental Quality regulations compel the Department to file a programmatic EIS on the cumulative effects of the "program." For the reasons stated below, this court finds neither of the Sierra Club's arguments to be persuasive.

### A. Areas of Scientific Controversy

The Sierra Club argues that there is a great deal of uncertainty in the scientific community concerning the hazardous effects of exposure to low-level radiation and concerning the ability of the Type B casks used in transporting the spent fuel rods to resist fire and impact forces. Under the plaintiff's theory, the existence of these scientific controversies requires the Department to file an EIS that at least explains the uncertainty because the proposed action *may* have a significant effect on the environment. The CEQ regulations include within the definition of "significantly" the degree to which the possible impacts on environment are "highly controversial" or "highly uncertain or involve unique or unknown risks" 40 C.F.R. § 1508.27(b)(4)–(5) (1990). Further, the D.C. Circuit has at least indicated that, if an agency cannot show that the proposed action will *not* have an identified danger, an EIS may be necessary. *See Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 154–55 (D.C.Cir.1985). There exists little authority concerning how great the difference of opinion must be in the scientific community to establish a scientific controversy sufficient to trigger an EIS[9] and the court must be wary not to overstep its bounds into the realm of evaluating the relative merit of conflicting scientific theories, which is committed to the discretion of agency experts. *See Sierra Club v. United States Dep't of Transp.,* 753 F.2d 120, 129 (D.C.Cir.1985).

### 1. Dose–Conversion Factors

The Sierra Club argues that the Department failed to disclose a substantial scienti-

---

**9.** Other circuits have held that there must be a "substantial" dispute concerning the effects of the proposed action. *See Lockhart v. Kenops,* 927 F.2d 1028, 1035 (8th Cir.1991) (citing *Rucker v. Willis,* 484 F.2d 158, 162 (4th Cir.1973)); *see also Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985) (stating that an EIS must be prepared if there are "substantial questions" concerning the environmental impact). In *Foundation for North American*

*Wild Sheep v. United States Dep't of Agric.,* 681 F.2d 1172 (9th Cir.1982), the Ninth Circuit held that an agency action was controversial because numerous experts and two state agencies had openly and sharply disputed the findings of the EA. *See id.* at 1182. None of these cases answer the difficult question of how many experts must dispute an agency's findings before it becomes "controversial."

fic controversy regarding dose-conversion factors. The Department, focusing on the deference which courts must show to the determinations of agency experts, argues that it reasonably selected a dose-conversion factor for RADTRAN IV's health effects computations that is supported by the vast majority of the scientific community. The dose-conversion factor is an equation or calculation that determines the risk of cancer entailed by exposure to any given dose of radiation. The dose-conversion factor thus is crucial in determining the health effects, including the number of cancer fatalities, in any situation where a population is exposed to radiation. In the calculations in its 1991 EA, the Department used a dose-conversion factor from the Committee on the Biological Effects of Ionizing Radiations' 1990 BEIR V Report (hereinafter "BEIR V") [10]; this conversion factor, 5.0E–04 latent cancer fatalities per person-rem, is actually somewhat greater than that used in the 1988 EA.[11] According to the Department's expert and a Nuclear Regulatory Commission report, the dose-conversion factor suggested by BEIR V is within a range that is generally accepted by health physicists throughout the world. *See* 4th Luna Decl. at ¶ 5. In calculating the risk factor, the 1991 EA used a conservative linear model, which directly relates the radiation dose and the number of fatalities. Linear models are favored over linear-quadratic models [12] by most scientists and generally predict higher numbers of fatalities than linear-quadratic models. *See* 54 Fed.Reg. 51659 (1989).

The Sierra Club responds with its own experts and scientific data, including recent studies of Japanese bomb survivors that suggest that dose-conversion factors should be revised upward substantially. *See* Resnikoff Aff. exhs. 4–6. The Sierra Club claims that these studies and others create a substantial scientific controversy that was not adequately addressed in any of the environmental assessments. Additionally, the Sierra Club notes that there is no general agreement on how to calculate low-dose radiation effects because most of the studies have focused on people exposed to high doses, such as the bomb survivors; the EA does not discuss this uncertainty.

The court rejects the Sierra Club's arguments for two reasons. First, the affidavits of the Department's experts have cast substantial doubt on the Sierra Club's scientific data. The studies concerning Japanese bomb data cited by plaintiff do not directly analyze a dose-response model or suggest a given dose-conversion ratio; while indicating that the health effects of radiation may be greater than previously anticipated, these studies aid the court and the Department little in selecting a dose-conversion factor. *See* 1st Luna Decl. at ¶ 27; 5th Luna Decl. at ¶ 8. Further, several of plaintiff's studies have been directly refuted by other scientists. *See* 1st Luna Decl. atts. 11–12. In addition, Dr. Gofman, one of plaintiff's principal experts, has been refuted not only by the Department's expert, but also by another district court which felt that an exclamation point was required to punctuate its rejection of Dr. Gofman's testimony against a previous BEIR report: "His obsession blinds his objectivity!" *Johnston v. United States*, 597 F.Supp. 374, 412 (D.Kan.1984).

---

**10.** *See* Committee on the Biological Effects of Ionizing Radiations, Board on Radiation Effects Research, National Research Council, *Health Effects of Exposure to Low Levels of Ionizing Radiation, BEIR V* (1990). The National Research Council draws its membership from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. "The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balances." BEIR V at iv.

**11.** The BEIR V calculations were not available in 1988. The Department at that time used a dose conversion factor suggested by the 1977 Publication 26 of the International Commission on Radiation Protection. *See* 1988 EA at 2.

**12.** In a linear-quadratic model, the incremental change in the health effects of a given dose of radiation is different for different doses of radiation, i.e. the higher the dose, the greater the effect of a small increase in dosage. In other words, the slope of the curve relating dosage to health effects is constant in a linear model, whereas the slope increases as dosage increases in a linear-quadratic model.

■ Second, NEPA does not require a federal agency to consider and discuss every viewpoint in the scientific community on a given matter. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378, 109 S.Ct. at 1861. Moreover, the BEIR V report and the scientific experts relied on by the Department appear to represent the views of the majority of scientists throughout the world. *See* 4th Luna Decl. at ¶ 5. With such a firm basis of support, the court can neither dispute the Department's findings nor state that there is a substantial controversy such that the Department's decision ·not to prepare an EIS should be overruled.

### 2. Type B Casks or Containers

The Sierra Club also ·raises questions concerning the risk of the escape of radioactivity from the Type B casks used to transport the spent nuclear fuel rods. The plaintiff has noted several instances where radioactivity has escaped from Type B containers, but these are completely different from Type B casks.[13] Even plaintiff concedes that there has never been a release of radionuclides from an accident involving Type B casks. Although the risks of such accidents must be included in the EA, there is no substantial controversy concerning the properties of Type B casks that would require the preparation of an EIS.

### B. Requirement of a Programmatic EIS

The Sierra Club argues that this court cannot examine the importation of spent nuclear fuel rods from Taiwan without considering this program as part of the government's larger policy of accepting nuclear fuel rods from foreign nations for storage, disposal, and reprocessing. Because these fuel rods are part of an entire program to acquire spent nuclear fuel rods from other countries, the government, according to the Sierra Club, must prepare a programmatic environmental impact statement which examines the cumulative impact of the multitude of shipments of spent nuclear fuel. The Department argues both that the Taiwan program is completely separate from the government's so-called off-site fuels policy, and thus not appropriate for a programmatic EIS, and that any consideration of the off-site fuels policy is not ripe because the policy is currently in abeyance.

The Department admits that the United States government has had a long-standing policy of importing spent nuclear material from foreign countries for reprocessing in order to insure that it is not used for non-peaceful purposes. *See* Stratford Decl. ¶¶ 3–7. No one is now questioning the wisdom of this eminently reasonable policy or the Department's authority to take actions in furtherance of it. From 1968 to 1988, the government maintained a program called the off-site fuels policy that imported spent nuclear fuel that had either been produced or enriched in the United States. *See id.* at ¶ 9. Under this policy, the foreign nations would ship the nuclear fuel, usually highly-enriched uranium, to a United States reprocessing facility, at which time the United States would take title to the material. *See* Denny Decl. at ¶ 3. The United States imported spent nuclear fuel from foreign nations in every year from 1978 to 1988. At the present time, the Department is considering whether to re-implement the off-site fuels policy for the next ten years.

The Taiwan spent fuel policy involves only fuel of foreign origin. The fuel rods are composed of natural uranium, not highly enriched uranium. *See id.* at ¶ 4. Under this program, the United States government takes title to the spent fuel rods in Taiwan and is responsible for shipping the material to a processing plant in the United

---

**13.** "Type B" refers only to the NRC certification required for packages that transport radioactive material in certain quantities. "Type B" packages range in size from small 40–pound packages that are much less than a cubic foot in volume to some massive Type B casks that are over 16 feet long and eight feet in diameter and weigh 200,000 pounds. *See* 2nd Luna Decl. at ¶ 33.

States. *See id.* The rationale behind the policy is also one of non-proliferation, though the Taiwan spent fuel policy in addition serves certain more specific national security interests.

■ The issue thus is whether the Taiwan policy and the off-site fuels policy are sufficiently related to require an overarching, or programmatic, EIS to cover their cumulative effects. While NEPA itself does not explicitly discuss the government's responsibility to prepare an environmental impact statement when a related series of government actions will have an environmental effect, the Council on Environmental Quality regulations include within the definition of a "major Federal action," the "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.18(b)(3) (1990).[14] The Supreme Court has further refined the situations when a programmatic EIS is necessary. "[W]hen several proposals for ... actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." *Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976). The court's power to review the Department's decision is narrow; the "decision whether to prepare a programmatic EIS [is] ... initially committed to agency discretion." *National Wildlife Fed'n v. Appalachian Regional Comm'n*, 677 F.2d 883, 889 (D.C.Cir. 1981). The court may only overturn an agency's decision not to prepare a programmatic EIS if the decision was unreasonable. *See id.*

■ The fact that the Taiwan policy and the off-site fuels policy serve the same non-proliferation policy goals is not sufficient to require a programmatic EIS; "mere commonality of objective" is not enough. *Foundation on Economic Trends v. Lyng*, 817 F.2d 882, 885 (D.C.Cir. 1987). *Kleppe*'s language demonstrates that the crucial issue is whether the various agency actions, when combined, have an effect on the environment that might be overlooked if examined separately; agencies cannot be permitted to "segment" their proposals for actions in a manner that disguises their environmental effects. *See Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C.Cir.1987) ("The rule against segmentation was developed to insure that interrelated projects the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions."). Thus, policy similarities are not the appropriate focus of the inquiry, but rather a court must examine the actual effect the programs have on the environment. If proposals for federal action have a series of environmental effects that will together cause substantial environmental harm, then the programs have a "cumulative" effect and must be examined in an EIS. Similarly, if proposed actions create an environmental effect that is greater than the sum of its parts, they may have a "synergistic" effect and thus require a programmatic EIS. *See Colony Federal Savings & Loan Ass'n v. Harris*, 482 F.Supp. 296, 302 (W.D.Pa.1980).

The Department attempts to distinguish the programs in a variety of ways that are little more than nonsense. One program focuses on highly enriched uranium and the other on natural uranium. One program involves U.S.-origin fuel and the other foreign-origin fuel. Under one program the United States takes title in Taiwan and in the other the United States takes title at a U.S. reprocessing plant. All of these distinctions are without a difference because

---

**14.** "Connected actions" are further defined as those that:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. 1508.25(a)(1) (1990).

NEPA demands an examination of *the environmental effect,* and the transportation of spent nuclear fuel, regardless of who owns it, where it comes from, or how radioactive it is, has the same effect—the environment and the people surrounding the transportation route might receive radiation that they would not otherwise receive. The Department's attempts to segment the policies on these grounds must fail.

 Nonetheless, the Sierra Club has not fulfilled its burden in showing that a programmatic EIS is required. The Department's assertion that no decisions have been made as to what port will accommodate spent fuel under the proposed off-site fuels policy is uncontroverted. The Sierra Club claims that ⅔ of the fuel under the old policy was taken through Hampton Roads and that it is reasonable to assume that future shipments will be brought through Hampton Roads. Although such an assertion may be reasonable, it is not a leap of logic that this court can make; indeed this litigation may alter the Department's policy in this regard. Often, when several government actions will have a similar effect on the same geographical area, an agency will be required to prepare a programmatic EIS. *See Izaak Walton League,* 655 F.2d at 374; *Environmental Defense Fund, Inc. v. Higginson,* 655 F.2d 1244, 1246 (D.C.Cir.1981); *see also* Mandelker, NEPA Law & Litigation § 9-15 (1984 & 1991 Supp.). Because such programs have their geographic expanse in common, they have a cumulative or synergistic effect. *See Izaak Walton League,* 655 F.2d at 374 ("a programmatic statement is appropriate only where the proposal itself is regional or systemic in scope, or where the proposal is one of a series of interrelated proposals that will produce cumulative systemwide effects that can be meaningfully evaluated together."). There is no evidence, however, at this time that

these proposed future shipments will pass through Hampton Roads.

The proposed actions at issue here do not fit within the paradigm of a highway or waterway project with many interrelated parts that will together substantially impact the environment in an entire region. Further, because it is unclear where future shipments will be imported, the proposed off-site fuel policy and this shipment of Taiwan spent fuel being brought through Hampton Roads cannot be meaningfully evaluated together.[15] The combination of an abstract proposed program which is undefined in geographic scope and a concrete action occurring in a discrete area of the country make for a difficult evaluation. A programmatic EIS should be prepared when it is "the best way" to evaluate a connected series of government actions. *See* 40 C.F.R. § 1508.25(a)(3) (1990); *Coalition of Sensible Transp., Inc. v. Dole,* 826 F.2d 60, 70 n. 8 (D.C.Cir.1987). A programmatic EIS is not the "best way" to evaluate the Taiwan spent fuel policy. The issue of whether the Department must file a programmatic EIS because it intends to ship spent fuel through Hampton Roads for the next ten years is not ripe and indeed may never ripen into a controversy. Thus the court will not overturn the Department's decision not to prepare a programmatic EIS as unreasonable.

## VI. The Adequacy of the Environmental Assessment

The Sierra Club's original motion for summary judgment sought a declaration that the Department's 1988 environmental assessment was legally inadequate. This issue was mooted by the filing in June, 1991 of a second environmental assessment concerning the risks of the importation of Taiwan spent fuel. In this EA, the Department responded to some of the Sierra Club's criticisms by examining the environ-

**15.** This is not to state that a programmatic EA and/or EIS should not be performed on the proposed off-site fuels policy. Indeed, this court is quite concerned about the Department's attempts to segment the shipments of nuclear fuel from foreign nations. The use of these artificial definitions and dividing lines does not permit the Department to avoid its responsibilities to the President, the Congress, and the public under NEPA. The issue of what sort of NEPA document the Department must file for this proposed program is not, however, before this court.

mental risk of using alternative East Coast ports through which to transport the spent fuel rods. The Sierra Club supplemented its complaint and its motion for summary judgment in September, 1991, arguing that the new EA is nonetheless inadequate.

■■■ While NEPA does not explicitly require an agency to take any action when it determines that a "major Federal action" has no significant impact on the environment, the Council on Environmental Quality regulations require the agency to explain its finding in a document known as an environmental assessment. *See* 40 C.F.R. §§ 1508.9, 1508.13 (1990). An environmental assessment must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no substantial impact." *Id.* at 1508.9(a)(1). To assess the adequacy of an environmental assessment's conclusion that there is no significant impact on the environment, this circuit has set out a four-part test. The court must assess " '(1) whether the agency took a 'hard look' at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.' " *Natural Resources Defense Council, Inc. v. Herrington,* 768 F.2d 1355, 1430 (D.C.Cir. 1985) (quoting *Sierra Club v. Peterson,* 717 F.2d 1409, 1413 (D.C.Cir.1983)). The

Sierra Club presents several grounds on which it alleges the EA is inadequate which the court will treat one by one below.

### A. Time of Exposure

The EA estimates a radiation exposure [16] time of one hour for surrounding areas prior to evacuation.[17] The Sierra Club argues that these times are unrealistic and that the Department has severely underestimated the time necessary to evacuate the affected areas. The Department claims that this estimate is conservative. In a situation where the dispute is one of pure scientific expertise, the court must defer to the agency's finding. *See Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983) ("When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential."); *Sierra Club v. United States Dep't of Transp.,* 753 F.2d 120, 129 (D.C.Cir.1985) ("When a court considers the sufficiency of an agency's environmental analysis, 'the court is not to rule on the relative merits of competing scientific opinion.' ") (quoting *Committee for Nuclear Responsibility, Inc. v. Seaborg,* 463 F.2d 783, 787 (D.C.Cir.1971)). The Department's estimate of the time of radiation exposure shall not be overturned as arbitrary or capricious.

### B. Human Error

The Sierra Club argues that the EA does not include any adjustment for human er-

---

**16.** The Sierra Club also claims that the EA underestimates the radiation dose outside of a spent fuel cask by ignoring the neutron dose derived from the neutron field that surrounds the cask. The EA, however, incorporates this neutron dose in its calculation of gamma radiation, which can have a potentially greater effect. *See* 1st Luna Decl. at ¶ 32. Thus the EA adequately treats the neutron dose by using a conservative estimate.

The Sierra Club also argues that the EA does not account for skyscatter and groundscatter, which increase the radiation dose when gamma radiation is reflected by the ground and sky. The EA does account for skyscatter in its cloudshine pathway. Reflection of radiation from the ground has its most significant effect

off city streets, which are not used in the transport of Taiwan spent fuel. *See* 2nd Luna Decl. at ¶ 32. With the limited information provided to the court on these matters, the court cannot find that the EA's treatment of this radiation was arbitrary or capricious.

**17.** The Sierra Club also argues that the Department failed to include the actual response times of local officials to respond to severe accidents and to cordon off affected areas. RADTRAN analysis does not assume any response other than evacuation after 24 hours of release of radioactive materials. Thus the Department's estimate is conservative and underestimates the risk.

ror in the loading and shipping of the casks.[18] The Sierra Club notes particularly that human error was central to prior nuclear accidents at Three Mile Island and Chernobyl. The dangers of human error are significantly reduced, however, in this situation because the transportation of Type B casks does not involve the complicated interactions between man and machine involved in maintaining a nuclear power plant. Regardless, the potential for human error in the loading and shipping of the casks is already accounted for in the EA. Accident probabilities were calculated using historical accident rates. These accident rates include any accidents caused or contributed to by human beings. Thus the EA impliedly accounts for human error and complies with the CEQ regulations. *See City of New York v. United States Dep't of Transp.*, 715 F.2d 732, 749–50 (2d Cir. 1983), *cert denied* 465 U.S. 1055, 104 S.Ct. 1403, 79 L.Ed.2d 730 (1984).[19]

## C. Lack of a Site–Specific Analysis

The Sierra Club argues that the Department's failure to consider real alternatives [20] is compounded by the Department's use of a generic port in its RADTRAN IV calculations that does not account for different characteristics at alternative ports. According to the plaintiff, by using a generic port, the EA effectively eliminates differences between ports and thus makes a choice between ports have little meaning. In addition, the use of a generic port violates the CEQ requirement that an EA discuss the "context" of a proposed action and sufficiently describe the affected area. *See* 40 C.F.R. § 1508.27(a) (1990). The Department denies these allegations and notes that, although it estimated certain variables such as local geography and weather conditions, it always overestimated the risk in order to render a conservative risk assessment.

The 1988 EA used bounding values for several variables that conservatively estimated the risks. The population surrounding Hampton Roads was assumed to be 3,861 persons/sq. mi., which is significantly greater than the actual population density. While such a value does overestimate the risk, approximations of population density do not permit the sort of comparisons between ports that NEPA requires. The 1991 EA, however, cures this problem by using actual population density values for each port and the highway route to be traversed. Thus, the Sierra Club's objections to the use of bounded values for population density is moot.

The 1991 EA continues to use conservative estimates for both weather patterns and local geography. While the EA could be more precise, the court does not find it unreasonable that the Department would use such approximations. It is impossible to predict the weather that would prevail when an accident might occur and the Department's decision to assume weather conditions that would be most likely to in-

18. The plaintiff's expert states that water in the cask caused by improper loading could increase the risk of a rupture in the casks. *See* 4th Resnikoff Decl. at ¶ 4(e). The Department, however, has stated that the casks are loaded dry and that water cannot get into the casks. *See* 1st Luna Decl. ¶ 38. Although the Sierra Club's expert claims that fuel rods are generally loaded into casks under water, they have presented no evidence that *these* fuel rods will be loaded in this way and thus they have not established a disputed issue of fact that would preclude summary judgment.

19. The court holds that the EA adequately accounts for human error in accidents involving typical loading, off-loading, and shipping of the cargo. The EA does not account for any human error that may have a specific effect on the shipping of spent nuclear fuel casks, e.g. an error in sealing the casks after the fuel rods have been loaded inside. The Sierra Club also argues that the EA does not adjust for human error in the design and manufacture of the casks. The Department states that any "significant" defects in construction would likely have been discovered during the yearly inspections required by the Nuclear Regulatory Commission. *See* 2nd Luna Decl. at ¶ 29. In light of the court's decision that the Department must include the full range of accidents in its EA, the court need not require the Department to account specifically for these risks as these errors will assumedly be subsumed into the new risk analysis.

20. The court's discussion of the 1991 EA's consideration of alternatives is below because it is, to some extent, independent of the adequacy of the EA's finding of no significant impact.

crease the radiological risk is sensible.[21] The assumption that the local topography is completely flat is also reasonable. Such an assumption maximizes the risk since varied land features tend to dissipate a radioactive cloud. *See* 1st Luna Decl. at ¶¶ 30–31. Therefore, the court finds that the use of bounding values in the 1991 EA do not violate NEPA.

### D. Exclusion of Risks Deemed Not Credible

In its calculation of the risk to the environment, the EA considers a range of possible accidents involving different sorts of stresses that could be placed on a given cask and different degrees to which a cask could be breached, thus releasing varying amounts of radiation. The actual risk to the environment is computed by multiplying the severity of the consequences of a given accident-type by the probability that such an accident could occur. The Department divided the risks into six accident-severity categories, ranging from very minor accidents to a conflagration and impact sufficient to create a hole one-inch in diameter in a single cask.[22] According to the EA, a larger breach in the cask was "not credible" and the analysis effectively assumed that such accidents could not occur. Over 90% of the possible accidents were assumed to fall within accident-severity categories 1 and 2.[23]

 The Sierra Club clearly disagrees with the Department's assessment of the risks inherent in the transport of spent nuclear fuel. Simple disagreement with an agency's findings or its methods is not, however, sufficient to render an EA inadequate. *See Los Angeles v. National Highway Traffic Safety Admin.*, 912 F.2d 478, 488 (D.C.Cir.1990). The Sierra Club does raise one salient point. The Department only considered risks which it deemed "credible" and the Sierra Club argues that the elimination of these low probability-high consequence scenarios skews the EA's assessment. The Department defined "credible" as an accident "that may reasonably be expected to occur during transportation";[24] an accident is not credible if it is "extremely unlikely to occur." Def.'s Mem.Supp.Summ.J. at 19; 1st Luna Decl. at ¶ 14. The Department argues that the probabilities of these accidents are so low that they need not be considered; indeed the Department suggests that an absurd event, such as a meteor striking a truck carrying nuclear fuel rods, would be required to create the sorts of risks that the Sierra Club is concerned about. Because no accident that could create a hole in a single cask greater than an inch in diameter is credible, the Department argues that it need not include them in the EA.

 The Department's decision to calculate risk by multiplying the consequences of a given accident by its probability is sound and comports with traditional principles of science. *See Carolina Envtl. Study Group v. United States*, 510 F.2d 796, 799 (D.C.Cir.1975). It is logical to discount the most horrible accidents by the fact that they are unlikely to occur; other-

---

21. Similarly, the EA's treatment of the transient population density, i.e. whether an accident occurs at rush hour, etc., is also adequate. The Department used conservative estimates and exact predictions are impossible.

22. RADTRAN III could model up to 8 accident-severity categories. The Sierra Club initially claimed that, by using only six categories, the Department had eliminated the two most severe types of risks. The crucial issue is the range of risks examined, not the number of categories into which the risks are divided in the computer model. RADTRAN IV can model up to 20 accident-severity categories.

23. The Sierra Club complains that the Department has reduced the number of accidents in accident-severity categories 5 and 6, thereby ar-

tificially minimizing the risk. While this may be true, the court must defer to the agency's distribution of the various risks, so long as all risks are included.

24. The study principally relied upon by the Department admits that "credibility" is a fairly subjective standard. *See* Wilmot, "Transportation Accident Scenarios for Commercial Spent Fuel," Sand 80–214, at 7 (1981) [hereinafter "Wilmot"]. According to the Department, the EA considers accidents with probabilities of 1 in a million and includes over 99% of the physically possible accidents. *See* 1st Luna Decl. at 13–14. Nonetheless, the Department admits that other accidents are possible.

wise the worst accidents would dominate a risk assessment to an improper degree. The Sierra Club implies that an EIS must be prepared because a catastrophic accident might occur. The court should, however, defer to an agency's decision to use a particular risk assessment methodology that is consistent with general principles of science. *See Sierra Club v. United States Dep't of Transp.*, 753 F.2d 120, 128–29 (D.C.Cir.1985).

The agency, however, violated its own methodology by refusing to include certain low probability risks. The Sierra Club has presented a variety of evidence concerning how more severe accidents could occur and the Department has disputed this evidence, stating that such accidents are not credible. The Department must, however, admit that such accidents are possible.[25] The court need not address the issue of what accidents can and cannot occur. The argument between the Sierra Club and the Department over the risk estimates is an argument about *probabilities* and should be expressed in the EA as such; the Department cannot simply eliminate those risks or avoid discussing their potential effects. No doubt the Sierra Club will still believe that the Department is underestimating the risks after the Department computes probabilities for the full range of possible accidents. Once the Department has included in its risk evaluation the full range of accidents, however, the court must defer to its determination of the probabilities because the issue will then, and only then, be one of a strict scientific controversy.

The Department's RADTRAN IV model insures that the Department need not brainstorm for all of the freakish types of accidents which might occur; the RADTRAN IV accident-severity categories do not focus on specific types of accidents, whether freakish or not, but rather depend on impact forces, fires, and certain-size breaches of the casks which release various levels of radionuclides. The Department need not include falling meteors in its assessment, but it does need to include the entire set of consequences that might occur from an accident. The Department's choice of risk assessment methodology is specifically designed to account appropriately for drastic consequence-low probability accidents. If the probability of the accident occurring is extremely low, then its effect on the risk assessment will be correspondingly small. Inclusion of these risks should not undermine the Department's finding of no significant impact, unless they are truly a sufficient risk to have been of concern. The court is not requiring that the EA be dominated by a "worst-case" scenario; the Department cannot, however, ignore such a scenario and eliminate any discussion of it and its effects from the EA.

The Department repeatedly cites *City of New York v. United States Dep't of Transp.*, 715 F.2d 732 (2d Cir.1983) for the proposition that it need only include credible accidents in its risk evaluation. This, however, is a misreading of *City of New York*. In that case, the 2nd Circuit held that the potential catastrophic consequences of an accident during the transportation of radioactive material did not *by themselves require the preparation of an EIS*; the probability of a catastrophic accident was sufficiently slight that § 102(2)(C) of NEPA was not *automatically* triggered. *See City of New York*, 715 F.2d at 745–48. The case did not state that an agency could refuse to include such calculations in its environmental assessments. Indeed, the court's opinion indicates that the Department of Transportation *did include* these high consequence-low probability events in its risk assessment. The Department's reliance on *Carolina Envtl. Study Group v. United States*, 510 F.2d 796 (D.C.Cir.1975), is similarly unfounded; in that case, the Atomic Energy Commission did discuss the most catastrophic, though

---

**25.** Indeed, the Department presented an "incredible" scenario, involving a shipwreck with an oil tanker, that did *not seem all that far-fetched. See* Def's Mem.Supp.Summ.J. at 20–22. The Sierra Club, of course, argues that there are many more "credible" accident scenarios. The court notes that the study that is central to the EA's determination of credible risks, *see* Wilmot, appears to have focused only on the impact forces, fires, and probabilities of rail and truck accidents; it does not explicitly discuss shipping accidents.

least likely, accidents in its EA. The D.C. Circuit's opinion in *Foundation on Economic Trends v. Heckler,* 756 F.2d 143 (D.C.Cir.1985) suggests that the Department must disclose all risks, even if they are small. In that case, an advisory committee stated that genetically-engineered bacteria could "possibly" be transported into the environment by insects or aerial transport, but that the number of cells would be small and subject to limiting processes. *See id.* at 153. The court held that it was improper for the government to ignore this risk, however small, and ruled that the EA "utterly fail[ed] to meet the standard of environmental review necessary before an agency decides not to prepare an EIS. *Id.* at 154.

The Department's decision is akin to saying that some things just cannot happen. Yet the Department cannot deny that such accidents are possible, nor can they deny that there are earthly forces (not meteorites) that can cause these accidents.[26] Further, although the Department discounts the possibility of human intervention—either through error or sabotage,[27] the risks remain. It is particularly important that a government agency be completely forthright about the risks of a program involving radioactive materials, which inspire great fear among many members of the public.[28] The Department's experts have designed a risk assessment methodology which should show these risks to be incredibly slight; they should not be afraid to use those methods on the full range of risks.[29]

## E. Consideration of Alternatives

The Sierra Club makes a further challenge to the EA that is not directly related to the sufficiency of the Department's finding of no significant impact. The Sierra Club argues that, even if the court accepts the finding of no significant impact, the EA may still be inadequate because it does not comport with NEPA's requirements concerning the consideration of alternatives. The argument focuses, in part, on the nature of an environmental assessment. If the entire purpose of an EA is simply to show that there is no significant environmental effect, then the Sierra Club's argument has no merit; indeed, under this view, the court would not have the power to take any action if it accepted the finding of no significant impact. If, however, an environmental assessment is more than simply a means to an end (the end being a FONSI), or if an EA is, in effect, a mini-environmental impact statement, then the court can examine the adequacy of the EA's consideration of alternatives, regardless of the

26. It should be noted that, while the participants of the Wilmot study came to a consensus on many issues, they did not all agree that a one inch hole was the largest credible accident; only a majority agreed with this assertion. *See* Wilmot at 8.

27. The court is well aware that the shipments of spent fuel are escorted by police and officials from the local, state and federal governments and that studies have indicated that the chance of sabotage is low. *See* 4th Luna Decl. at ¶ 9. Nonetheless, these risks cannot be ignored. The Wilmot study expressly did not consider accidents that could be caused by human error or sabotage, though it admitted that such possibilities "exist." *See* Wilmot at 7. The study even suggested one possible error ("improperly torquing head bolts") that could lead to an accident. *See id.* Further, the fuel casks that would carry the spent fuel, though inspected yearly, have never actually been tested to determine their limits. *See id.* at 12. To the extent that sabotage or human error in design, manufacture or handling could help to create the

forces that would cause a release of radionuclides, these factors must be considered.

28. The Department may be concerned that discussion of a severe accident will simply generate public concern that is unwarranted in light of the low probability of the risk. While such concerns may be valid, NEPA is fundamentally about disclosure, regardless of the potential controversy. *See Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693, 697 (2d Cir.1972).

29. The Sierra Club further argues that the release fraction used by the EA that determines the amount of cesium released in case of a burst rupture of the cask is too low. The court notes that the Sierra Club's assertion appears to be based on an improper citation to a Nuclear Regulatory Commission study. *See* 1st Luna Decl. at ¶ 22–23. In light of the court's ruling concerning the risks which the EA must analyze, this issue need not be resolved. If a higher release fraction is required by the Department's new risk analysis, then it should be used.

FONSI.[30]

The Department argues first that, since there is no significant impact on the environment, it need not consider alternatives; the Department's initial memoranda concerning the 1988 EA, which analyzed no East Coast ports other than Hampton Roads, took the position that the examination of alternatives would serve no purpose since the impact was insignificant. This argument has persisted in the government's memoranda, although the Department appears to have changed its position somewhat. The 1991 EA contains analysis of two other East Coast ports, in apparent response to the arguments of the plaintiff, and the Department now appears more willing to accept the requirement that it must consider at least some alternatives. Nonetheless, the Department maintains the position that the 1988 EA's discussion of alternatives was also adequate.

The Sierra Club's position on this issue also has evolved throughout the proceedings. The Sierra Club has always argued for a strong interpretation of the requirement of alternatives. In its original memoranda attacking the 1988 EA, the Sierra Club stated that it simply wanted the Department to consider some of a list of other commercial and military ports on the East Coast; this list included Wilmington, NC, and Charleston, SC. Now the Sierra Club argues that consideration of these two alternatives is still not sufficient because the Department continues to ignore alternatives with even smaller populations.

NEPA and the CEQ regulations make it clear that an agency must always consider alternatives to a proposed action. Under the regulations, an environmental assessment is:

(a) a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact state-ment or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action, and alternatives, and a listing fo agencies and persons consulted.

40 C.F.R. § 1509.9 (1990)

While subsection (a)(1) indicates that one of the functions of an EA is to explain whether the evidence supports a finding of no significant impact, the other subsections demonstrate that an EA has a larger purpose. Under section (a)(2), the EA should "[a]id an agency's compliance," suggesting that the EA, while a less substantial document, is intended to aid decisionmaking and fulfill the purposes of an EIS, albeit to a lesser degree. The CEQ's implementing regulations must be read in the same spirit as NEPA, the statute which created the CEQ. *See Foundation on Economic Trends v. Lyng*, 817 F.2d 882, 884 n. 6 (D.C.Cir.1987). NEPA's focus is on disclosure of information, both to the governmental decisionmakers and to the public. The EA should set out relevant information to help the decisionmaker choose a policy option (and to help others evaluate that choice), and not simply to provide a justification as to why a choice is permissible (i.e. why there is no significant impact). Thus an EA is more than simply the agency's *post hoc* rationalizations of its decision.

Further, subsection (b) requires that an EA discuss alternatives. It is particularly important to note that section (b) is an independent requirement of an EA, separate from its function to provide evidence that there is no significant impact. *See River Road Alliance, Inc. v. Corps of Engineers*, 764 F.2d 445, 452 (7th Cir.1985), *cert. denied*, 475 U.S. 1055, 106 S.Ct. 1283,

---

**30.** The court's treatment of the issue of alternatives applies regardless of the finding that the EA is inadequate because it fails to consider the full range of risks. The same analysis is appropriate even if the FONSI were undisputed.

89 L.Ed.2d 590 (1986) ("This requirement is independent of the question of environmental impact statements, and operative even if the agency finds no impact.... For nonsignificant impact does not equal no impact; so if an even less harmful alternative is feasible, it ought to be considered."). The provision cites directly to the independent section in NEPA that sets out the mandate that agencies seek alternatives.[31] Thus an EA serves the statutory purposes of NEPA beyond that of being an initial step toward an EIS or a FONSI. Were an EA simply a statement that an agency can take an action without filing an EIS, EA's would not fulfill the mandate of NEPA nor provide the decisionmaker or the public with information about the choice. Thus, the court may review the adequacy of the EA, independent of the Department's finding of no significant impact. *See Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228–29 (9th Cir.1988), *cert. denied*, 489 U.S. 1066, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989); *City of New York*, 715 F.2d at 742.

The court must assess whether the agency took "a hard look at the alternatives and explains its reasons for rejecting them." *Coalition on Sensible Transp., Inc. v. Dole*, 642 F.Supp. 573, 593 (D.D.C.1986), *aff'd*, 826 F.2d 60 (D.C.Cir.1987). This circuit has suggested that the range of alternatives that must be considered be limited by a "rule of reason." *See Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827 (D.C.Cir.1972); *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C.Cir.1988).[32] The

" 'rule of reason necessarily governs both *which* alternatives the agency must discuss and the *extent* to which it must discuss them.' " *Id.*, 865 F.2d 288 (quoting *Alaska v. Andrus*, 580 F.2d 465, 475 (D.C.Cir. 1978), *vacated in part as moot*, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (emphasis in original)). A court may even require an agency to consider alternatives that are outside the agency's scope of authority, because the information of the EA or EIS may be useful to the President, Congress, and the public in shaping policy on a larger scale. *See Morton*, 458 F.2d at 836. Nonetheless, "the smaller the impact, the less extensive a search for alternatives can the agency reasonably be required to conduct." *River Road Alliance, Inc. v. Corps of Engineers*, 764 F.2d 445, 452 (7th Cir.1985); *see also City of New York v. United States Dep't of Transp.*, 715 F.2d 732 (2d Cir. 1983). In addition, an agency need not "consider alternatives when such consideration would serve no purpose" or when they are speculative. *Natural Resources Defense Council, Inc. v. S.E.C.*, 606 F.2d 1031, 1054 (D.C.Cir.1979).

The question thus comes down to whether the Department's 1991 EA adequately considers a reasonable range of alternatives. In its original motion for summary judgment asking the court to declare the 1988 EA inadequate, the Sierra Club listed eleven commercial and military ports on the East Coast that are closer to the Savannah River site. The 1988 EA had considered no other East Coast alternatives.[33]

---

**31.** If section 102(2)(E) of NEPA did not have an independent meaning, then it would be no more than a duplication of § 102(2)(C)(iii) which requires the consideration of alternatives when preparing an EIS. *See Hanly v. Kleindienst*, 471 F.2d 823, 834–5 (2d Cir.1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

**32.** Whether an agency's consideration of alternatives is a question of substance or procedure greatly affects the scope of this court's review. Procedural aspects are reviewed strictly, whereas substantive decisions must be examined under the arbitrary and capricious standard. One panel of the D.C. Circuit has held that the issue of alternatives is a mixed question of substance and procedure. *See Natural Resources Defense Council, Inc. v. S.E.C.*, 606 F.2d 1031, 1044

(D.C.Cir.1979). This court holds that the "rule of reason" set out in *Morton* is the correct standard, but also finds that the Department's failure to consider alternatives adequately was an abuse of discretion under 5 U.S.C. § 706 (1988).

**33.** Although the 1988 EA is not before the court at this time, the court notes that its consideration of alternatives was completely inadequate. The 1988 EA compared Hampton Roads to 1) a generic West Coast port, which was clearly less safe because of the lengthy overland route, 2) reprocessing at the Idaho facility which was rejected in a sentence as "not ... viable," and 3) the "no-action" alternative, which was dismissed as contrary to national security interests. *See* 1988 EA at 10. None of these were real alternatives.

The 1991 EA, however, includes risk comparisons with the importation of fuel rods through Wilmington, North Carolina, and through Charleston, South Carolina. The 1991 EA concludes that, although the risk is less at these two ports, the difference in the risk is so small that the Department can go ahead with its plan to bring the fuel rods in through Hampton Roads. According to the FONSI, the experience which Hampton Roads possesses in handling spent nuclear fuel rods also led the Department to conclude that selection of a port with a slightly less overall risk was not warranted. *See* FONSI at 7. The Sierra Club, despite having included Wilmington and Charleston on its list of potential ports, argues that the EA is still insufficient.

 A federal agency need not consider all possible alternatives for a given action, nor must the agency select any particular alternative. *See Morton*, 458 F.2d at 836. Rather, the agency must consider a range of alternatives that covers the full spectrum of possibilities.[34] The discussion of alternatives need not be exhaustive, but it must "be sufficient to demonstrate reasoned decisionmaking." *Fritiofson v. Alexander*, 772 F.2d 1225, 1236 (5th Cir.1985); *C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1574 (11th Cir.1988) (stating that the court must assess whether the agency has made a "reasoned choice").

 The selection of Charleston and Wilmington as alternatives for analysis in the EA does not, however, cover the full spectrum of possibilities and this court finds that the agency's action was not reasonable. Indeed, the agency's choice of alternatives was quite calculating and qua-

lifies as an abuse of discretion under 5 U.S.C. § 706. There is no dispute that the lower the population and the population density of a port, the less the risk of latent cancer fatalities associated with the importation of nuclear fuel rods. The Sierra Club has long attacked the choice of the Department to use Hampton Roads, Virginia, a port which is proximate to six of the seven largest cities in Virginia with a total population of over 1 million. While NEPA does not permit the Sierra Club to assail this choice directly, *see Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983), NEPA does require that the agency examine real alternatives. The Department need not select the port with the least risk, but it needs to consider ports across the full spectrum of possibilities and to explain the reasons for the choice made.

Of the eleven ports suggested by the plaintiff, only one, Savannah, GA, has a population density (2,585 people/sq. mi.) greater than Hampton, VA (2,456 people/sq. mi.).[35] *See* U.S. Dep't of Commerce, Bureau of the Census, County and City Data Book, 1988, at 634, 714 (1988) [hereinafter "County and City Data Book, 1988"]. The Department did not analyze Savannah in its EA, but it did elect to examine Charleston, whose population density (1,952 people/sq. mi.) is the third highest of all of the ports and Wilmington, whose population density (1,796 people/sq. mi.) is the fourth highest. *See id.* at 690, 706. Thus, of the eleven ports identified by plaintiff as possible ports of entry, the EA analyzed the second, third, and fourth most densely populated ports (and selected the port with

---

**34.** In response to a question concerning the number of alternatives which an agency must consider, the CEQ stated:

When there are potentially a very large number of alternatives, only a reasonable number of examples, covering the *full spectrum* of alternatives, must be analyzed and compared in the EIS.... What constitutes a reasonable range of alternatives depends on the nature of the proposal and the facts in each case.

46 Fed.Reg. 18026 (1981) (emphasis in original).

**35.** Jacksonville, FL, has a significantly greater population (pop. 609,860) than Hampton Roads (126,000), though its population density is much less (803 people/sq. mi.). *See* County and City Data Book, 1988, at 634. Hampton Roads is, however, surrounded by the cities of Virginia Beach, Norfolk, Newport News, Chesapeake, Hampton, and Portsmouth. The entire metro-

the highest risk factor of the three).[36] The EA did not consider other commercial ports with lower population densities or military ports in rural areas.[37]

The Department never explains why it does not consider these other ports, stating simply that, if it has to consider any alternatives, it should suffice that it considered two others. The Department further argues that the plaintiff must fulfill some burden of proof as to why the Department must examine one alternative or another. Unquestionably, the plaintiff cannot simply throw out innumerable alternatives to waste the agency's time, but the agency should consider feasible alternatives. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978). The Sierra Club has suggested a list of commercial and military ports that have sufficient channel depths to accommodate the ships that carry spent nuclear fuel. *See* Pl.'s Mem.Supp.Sum.J. at 14–18. The Sierra Club also noted that a military port might provide additional advantages in terms of security and experience in handling nuclear material. NEPA and its accompanying regulations place an

affirmative obligation on the agency to consider alternatives and if a certain range of reasonable alternatives are not considered in the assessment, then the agency should have some explanation as to why they were not considered. Perhaps the ports suggested by the Sierra Club cannot handle this sort of cargo or represent significant security problems. The task of an environmental assessment, in part, is to briefly examine and dispense with alternatives; thus, the Department should have explained why these alternatives were not appropriate in the EA.[38] *See Coalition on Sensible Transp., Inc. v. Dole,* 642 F.Supp. 573, 593 (D.D.C.1986). As it stands now, neither the EA nor the Department's legal memoranda through three years of litigation have explained why these alternative ports are inappropriate even for *consideration,* much less for selection as the port of entry of Taiwan spent fuel.

The consideration of alternative lower density ports on the East Coast is not a speculative or random alternative, but is the most obvious of all possible alternatives. The Sierra Club has not suggested bizarre alternatives such as sending the fuel rods on spaceships to the sun;[39] the

politan area around Hampton Roads has a population of 1,309,400. *See id.* at E–10.

**36.** The Department has, in effect, admitted that its choice of ports was not even intended to examine the effect on the risk of using a port with a lower population density. "The ports at Wilmington and Charleston were included to demonstrate in the 1991 EA that a *reduction of overland distance from other port locations* on the East Coast would not result in a significant reduction of risk." Def's.Supplemental Mem. Supp.Mot.Summ.J. at 7 n. 10 (emphasis added).

**37.** Among the other ports suggested by the Sierra Club, Morehead City, NC, has a population of only 5,760 and Carteret County which contains it has a population of 50,900 (97 people/sq. mi.). *See* County and City Data Book, 1988, at 36, 773. Fernandina Beach, FL, has a population of 8,800 and lies in Nassau County which has a population of 42,000 (65 people/sq. mi.). *See id.* at 81, 738. St. Mary's, GA, has a population of 6,900 and lies in Camden County which has a population of only 19,400 (30 people/sq./mi.). *See id.* at 81, 740.

**38.** The Department must set out alternatives and explain the reasons for making the choice that it does. While the court does not hold that

the Department's explanation of its choice is insufficient because it holds that the Department has not yet considered the range of alternatives that it must, the court notes that the EA does not at all discuss why Hampton Roads was selected. The FONSI states in three sentences that the experience of Hampton Roads in handling spent nuclear fuel rods was an important factor of its choice. The Department, however, categorically denies that this experience played any part in its evaluation of the relative risks of importing fuel rods through different ports. *See* 1991 EA at 28. Additional justifications for the choice of Hampton Roads have been revealed during this litigation and the court suggests that these reasons be part of the government's environmental documentation. *See* Def. Resp. to Int. #16 (citing the experience of Hampton Roads workers, the preferences of foreign shippers and Department contractors, and excellent facilities).

**39.** One author has noted a difference between primary and secondary alternatives. *See* Mandelker, NEPA Law & Litigation §§ 9:17, 9:23 (1984 & 1991 Supp.). A primary alternative "is a substitute for agency action that accomplishes the action in another manner." *Id.* at § 9:17 (quoting Mandelker, Environment and Equity

Department could analyze any of the ports listed by the plaintiff and such a choice would require no shift in policy or advance in technology. Computing the risk assessments for other ports only requires the input of new values into RADTRAN IV, not the design of a different simulation. Consideration of alternatives across the full spectrum of possibilities will simply prevent the Department from skewing its environmental analysis by selecting ports that are high in population density.

That the Department has determined that there is no significant impact does not diminish its responsibility to seek alternatives to such an extent that the 1991 EA fulfills the requirements of NEPA. Because there is little impact does not mean that there is no impact.[40] *See River Road Alliance, Inc. v. Corps of Engineers,* 764 F.2d 445, 452 (7th Cir.1985). If a government agency chooses a port with a risk level that is ten times that of another port, regardless of the smallness of this risk, NEPA and its implementing regulations insure that the President, Congress, and the public are informed why such a choice was made. Although, according to the Department, the overall risk of the project is not greatly affected by the differing population densities, it is nonetheless relevant to the port dwellers that the Department has chosen a port where the risk is relatively high. While the risks are small in absolute terms, the relative risks reveal that there are significant differences in the risk of a port accident as population density varies. Whereas the overall radiological risk of importation through Hampton Roads is only 8% higher than through Wilmington, *see* 1991 EA at 24, and 17% higher than through Charleston, the radiological risk of a *port accident* is 190% higher at Hampton Roads than at Wilmington and 163% higher

than at Charleston. *See id.* These differences are particularly important in a situation involving nuclear material where the worst case scenario is catastrophic, if highly unlikely, and the subject of great public concern. Even the Department's least likely credible accident would result in the exposure of hundreds of thousands of people over a 379 sq. km area to excess radiation. *See* 1988 EA app. VII.

Further casting doubt on the Department's decisionmaking process is its change in policy that led the Department to bring the fuel rods in through Hampton Roads rather than through a West Coast port as was originally planned. After two years of unsuccessful litigation, the Department decided to try the East Coast which does indeed provide a safer route to the Savannah site. All of the Department's plans have involved transit of the nuclear fuel rods to the Savannah River processing site. The 1991 EA states that the Idaho processing site "does not handle natural uranium products." 1991 EA at 4. It has never been clear to the court whether this facility *cannot* process such uranium or whether some modification would be required or whether the government simply prefers the Savannah site based on economic or other considerations. The only evidence that has been presented indicates that the Idaho facility is actually more sophisticated than the Savannah site because it can extract krypton gas from spent fuel products. *See* GAO Letter at 4. Use of this facility would decrease the risk levels in conjunction with transporting the fuel rods through a West Coast port and could achieve the shortest and least costly possible transit route. Once again, the court does not (and cannot) say that the Department must use the Idaho site, but the De-

---

120 (1981)). Such alternatives often involve drastic shifts in the manner by which policy goals are achieved or require action that is outside the agency's scope of authority. Secondary alternatives simply provide a different manner in which to complete an agency action. *See id.* A secondary alternative may involve "a different location for a project, or project changes that mitigate harmful environmental effects." *Id.* The author notes that courts "have usually required consideration of secondary al-

ternatives to a proposal," but are less likely to require the consideration of a primary alternative. *Id.*

**40.** Indeed, even if a project is found to be environmentally beneficial, an agency must still consider alternatives. *See Environmental Defense Fund, Inc. v. Corps of Engineers,* 492 F.2d 1123, 1135 (5th Cir.1974).

partment has never clearly explained why this is not a feasible and sensible alternative.

In sum, the Sierra Club is not demanding (and the court is not holding), as the Department claims, that the Department must choose the port with the least possible risk. Rather, the court is simply attempting to enforce the language and the spirit of NEPA, which is designed to insure that an agency's single-minded approach to a proposed action is tempered by the consideration of other feasible options that may have different (and fewer) environmental effects. Here the court does not believe that the Department took a "hard look" at a reasonable range of alternatives when it prepared its 1991 EA and selected the port of Hampton Roads. In order to insure that the Department is not left unsure of what will be required of their next EA, the Department shall be directed to prepare a new EA which otherwise complies with NEPA and examines at least two other ports that have significantly lower population densities than those already considered (or explains why other ports on the East Coast are not feasible alternatives).

### F. Cumulative Risk

Although the court holds that the Department need not file a programmatic EIS, the court nonetheless does not believe that the Department can ignore the fact that, by continuing to bring spent fuel through a single port, a narrow range of the population bears the entire risk. The accident risk calculated by the EA does not cumulate; once a shipment has been completed safely, there is no residual threat of accident. The incident-free risk to handlers and those along the transportation route has, however, a probability of 1; these people *will* receive some increased dose of radiation. While all agree that this dose is extremely small, nonetheless it is relevant that multiple shipments passing over the same route will expose many of the same people to the incident-free dose each time fuel rods are transported. At least 200 shipments have passed through Hampton Roads over the last 10 years. While the handlers and port workers probably were not always the same for each shipment, some people along the transportation route assumedly have been exposed to this minimal amount of radiation repeatedly. In its new EA, the Department should calculate this cumulative dose, explaining the amount of radiation, the number of people it might involve, and its potential health effects. The court does not impose this requirement to arouse public furor that Hampton Roads appears to be the port of choice for nuclear fuel shipments, but rather to insure that, as the court assumes the Department's calculation will reveal, those along the transportation route know that exposure to multiple incident-free doses has a very minimal health effect on them.

### VII. The Appropriateness of Injunctive Relief

The court has its traditional equitable discretion in deciding whether an injunction is appropriate in this case. *See Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987). A violation of NEPA does not of itself require that an injunction issue, *see id.*, but the court must balance the competing harms. Environmental harms are rarely, however, remediable by relief other than an injunction. The Department admits that there will be some exposure to radiation due to the incident-free dose. Admittedly these doses are below those permissible by law and cannot by themselves serve as a basis for an injunction; the Department has not, however, calculated the risk from repeated exposure to such doses to those along the transportation route. Further, permitting the importation of the nuclear fuel rods will unquestionably create a risk of greater environmental harm (through an accident), which, in light of the court's holding, cannot at this time be said to be insignificant. Requiring an adequate environmental assessment will insure that the risk is sufficiently minimal that the Department would choose to proceed with its program through Hampton Roads or perhaps would reveal that another more safe port is a preferable port of entry. The court finds that the public in-

terest will be served both by the simple enforcement of NEPA and by insuring that an appropriate risk analysis is completed before the shipment is completed. Further, the Department, while explaining the national security interests furthered by the Taiwan spent fuel program, has not specifically demonstrated that a delay in shipment pending preparation of a new EA will have a deleterious effect on these interests; indeed the Department has stated only that its shipping schedules will be disrupted, that its costs will be increased, and that the reliability of the United States might be questioned. *See* Def.'s Mem.Supp.Summ.J. at 55. Thus, the court shall enjoin the shipment of Taiwan spent fuel through Hampton Roads until a new and adequate EA has been completed.

## VIII. Conclusion

The court is aware that such strict adherence to the language and purpose of NEPA is unusual in a case that centers around the adequacy of an environmental assessment; many courts only "get tough" when an EIS is required. Government agencies often complain of the burden which NEPA places on them and strict enforcement of the statute, particularly when the environmental impact is ostensibly small, is unwelcome. Nonetheless, the statute puts in place a process for the consideration, documentation, and disclosure of environmental information in all governmental decisionmaking and it is not to be circumvented. While courts should often defer to agency decisionmaking, they must be vigilant to insure that agencies pushing the line of NEPA compliance do not overstep it, else the statute becomes of little meaning.

Five years ago, the Department of Energy attempted to import spent nuclear fuel rods from Taiwan through a West Coast port without filing the documentation required by NEPA. Once they were caught by an environmental group and enjoined by a prior lawsuit, the Department shifted its plans to an East Coast port and filed an EA

which did not consider real alternatives. The Department filed a second EA in 1988 that similarly did not consider real alternatives. The Department was sued once again and the plaintiff specifically identified a variety of perceived flaws in the EA. In 1991, the Department again filed an EA, correcting some, but not all, of the problems. For the reasons stated above, this EA is almost adequate, but not quite. While none of the parties and especially not this court wish to waste government time and resources, the Department must make another attempt to comply with the law. It is not this court's order, but rather it is the Department's failure to follow the requirements of NEPA that has forced this duplication of effort.[41]

For the foregoing reasons, the plaintiff's motion for summary judgment, as supplemented, shall be GRANTED in part and DENIED in part and defendants' cross-motion for summary judgment, as supplemented, shall be GRANTED in part and DENIED in part in a separate order filed on this date.

## ORDER AND JUDGMENT

Upon consideration of the memoranda and supplemental memoranda of plaintiff and defendants, and the record herein, and for the reasons stated in the accompanying memorandum opinion, it is hereby ORDERED that the plaintiff's motion for summary judgment is GRANTED in part and DENIED in part and the defendants' cross-motion for summary judgment is GRANTED in part and DENIED in part as follows:

1. The defendants' failure to prepare an environmental impact statement concerning the importation of 118 spent nuclear fuel rods from Taiwan does not violate the National Environmental Policy Act, codified at 42 U.S.C. §§ 4321 *et seq.* Therefore, plaintiff's motion for summary judgment on this ground is hereby DENIED and defendants' cross-motion for summary judgment on this ground is hereby GRANTED, and this

**41.** The amount of time and resources spent defending this lawsuit dwarfs the effort that would have been expended had the Department simply analyzed all eleven ports suggested by plaintiff and examined the full range of risks.

claim is hereby DISMISSED WITH PREJUDICE;

2. The defendants' failure to prepare a programmatic environmental impact statement concerning the importation of spent nuclear fuel rods from Taiwan and other foreign nations does not violate the National Environmental Policy Act. Therefore, plaintiff's motion for summary judgment on this ground is hereby DENIED and defendants' cross-motion for summary judgment on this ground is hereby GRANTED, and this claim is hereby DISMISSED WITH PREJUDICE;

3. The defendants' environmental assessment is inadequate under the requirements of the National Environmental Policy Act and the Council on Environmental Quality regulations. The environmental assessment does not evaluate the full range of risks involved in the shipment of 118 spent fuel rods from Taiwan and fails to adequately consider a reasonable range of alternatives as required by NEPA. Therefore, the defendants' cross-motion for summary judgment on this ground is hereby DENIED and the plaintiff's motion for summary judgment is hereby GRANTED as follows:

A. It is hereby DECLARED that the June 1991 environmental assessment prepared by defendants on the importation of spent nuclear fuel from Taiwan is legally defective and does not comply with the National Environmental Policy Act and the Council on Environmental Quality regulations.

B. It is hereby ORDERED that the defendants are ENJOINED from importing the 118 spent nuclear fuel rods from Taiwan until the defendants have filed an adequate environmental impact statement or have completed a satisfactory environmental assessment which:

i. Includes discussion and analysis of the full range of risks involved in the transportation of Taiwan spent fuel;

ii. Considers a reasonable range of alternatives, including two low-population density ports on the East Coast that are near the Savannah River processing site or explains why no such sites are feasible alternatives;

iii. Explains the reasons for not selecting the Idaho processing site;

iv. Includes an analysis of the risk of repeated exposure to incident-free radiation doses by those along the transportation route;

v. Finds no significant impact to the environment.

Final judgment having now been entered, this case stands DISMISSED WITH PREJUDICE.

SO ORDERED.