**THE FUND FOR ANIMALS,
et al Plaintiffs,**

v.

**Gale NORTON, et al, Defendants,**

**Greater Yellowstone Coalition,
et al Plaintiffs,**

v.

**Gale Norton, et al, Defendants,**

**No. CIV.A. 02–2367(EGS).**

United States District Court,
District of Columbia.

Dec. 16, 2003.

Order Denying Stay Dec. 23, 2003.

Eric Robert Glitzenstein, Howard M. Crystal, Meyer & Glitzenstein, Washington, DC, Donald L. Honnold, Bozeman, MT, for Plaintiffs.

Lauren Beth Fischer, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION

SULLIVAN, District Judge.

### I. Introduction

Plaintiffs the Fund for Animals ("Fund") and the Greater Yellowstone Coalition ("Yellowstone Coalition") challenge the National Park Service's ("Service" or "NPS") administrative decision, codified in a 2003 Supplemental Environmental Impact Statement ("SEIS") and Record of Decision ("2003 ROD"),[1] to allow continued

---

1. On December 11, 2003, the Final Rule was published in the Federal Register. Winter Use Plan Final Rule, 68 Fed.Reg. 69,268 (Dec. 11, 2003) (to be codified at 36 C.F.R. pt.7). Although slight changes exist between the 2003 ROD and the Final Rule, the major tenets remain the same, and thus review of

snowmobiling and trail grooming[2] in Yellowstone National Park, Grand Teton National Park, and the John D. Rockefeller, Jr. Memorial Parkway (collectively "Yellowstone" or "Parks"). Plaintiffs allege that snowmobiling and trail grooming cause air and noise pollution, threaten wildlife and endangered species, and create health threats to visitors and park employees. Given these adverse effects, plaintiffs argue that NPS's decision to allow the continuation of these winter activities belies the evidence collected during the rule-making process, thus violating the Administrative Procedure Act's ("APA") prohibition against decision-making that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2003). Specifically challenged are the Service's failure to act with regard to Plaintiff Bluewater Network's January 1999 Rulemaking Petition seeking a ban on snowmobiling and trail grooming throughout the National Park System, and the Service's issuance of the 2003 SEIS and March 2003 ROD, which allow snowmobiling and trail grooming to continue.[3] Pending before the Court are cross motions for summary judgment filed by all parties to the case.

Upon careful consideration of the motions, the responses and replies thereto, the oral arguments of counsel, the entire record herein, as well as the governing statutory and case law, and for the following reasons, it is by the Court hereby ordered as follows:

a) The March 25, 2003, Record of Decision; February 2003 Supplemental Environmental Impact Statement; and December 11, 2003, Final Rule are vacated and remanded to the National Park Service, U.S. Department of the Interior, for further proceedings not inconsistent with this Opinion;

b) The prior January 22, 2001, Final Rule, as modified by the November 18, 2002, Final Rule, shall remain in effect until further Order of the Court; and

c) The National Park Service shall respond to Bluewater Network's Rulemaking Petition by no later than February 17, 2004.

**A. Parties**

1. *Plaintiffs*

Plaintiff The Fund for Animals is a national non-profit membership organization "committed to preserving animal and plant species in their natural habitats, and to preventing the abuse and exploitation of both wild and domestic animals." Am. Compl. ¶ 7. The Fund brings this action on behalf of its members, and submitted briefs on behalf of organizational co-plaintiffs Bluewater Network ("Bluewater") and the Ecology Center, as well as individual plaintiffs Walt Farmer, George Wuerthner, Phillip Knight, and Richard Meis.

Plaintiff Greater Yellowstone Coalition is a "conservation organization dedicated to protecting and restoring the Greater

the 2003 SEIS and ROD is still appropriate. The publication of the Final Rule does, however, negate any ripeness concerns previously raised by the defendants.

2. Trail "grooming" is the packing of snow along trails to facilitate winter use. At the November 20, 2003, Motions Hearing, plaintiffs stated that, without this grooming, snowmobiles are unable to traverse Park lands. *See* Tr. Hr'g, Nov. 20, 2003, at 59–61.

3. The Fund plaintiffs originally alleged that promulgation of the December 2002 rule unlawfully withheld and unreasonably delayed agency action in violation of 5 U.S.C. § 555(b) and § 706(1), and also violated NEPA. *See* Consol. Am. Compl. ¶¶ 148, 164; Final Delay Rule, 67 Fed.Reg. 69,473 (Nov. 18, 2002). However, in light of the publication of the 2003 Final Rule, plaintiffs concede that the Court is no longer faced with this issue. *See* Fund Pl.'s Supplemental Br. at n. 2. The Court concurs.

Yellowstone ecosystem and the unique quality of life it sustains." Am. Compl. ¶ 18. The Yellowstone Coalition brings this action on behalf of its members, and submitted briefs on behalf of five other co-plaintiff non-profit organizations: the National Parks Conservation Association, The Wilderness Society, the Natural Resources Defense Council, the Winter Wildlands Alliance, and the Sierra Club.

The two groups of plaintiffs, represented separately by the Fund and the Yellowstone Coalition, seek different relief, and consequently have somewhat conflicting interests. The Fund ultimately seeks a cessation of trail grooming in the Parks. Greater Yellowstone seeks a gradual phase-out of snowmobile use in favor of mass transport snowcoach use; in essence, the implementation of the 2001 Final Rule, which did not call for an end to trail grooming. Snowcoach Rule, 66 Fed.Reg. 7,260 (Jan. 22, 2001). Thus, if the 2001 Rule is implemented, the Fund Plaintiffs will not obtain their desired relief because grooming will continue. Conversely, if trail grooming is enjoined, neither snowmobiles nor snowcoaches will be able to travel over the unpacked snow, thus making actual implementation of the 2001 snowcoach plan impossible.

### 2. *Defendants*

Secretary of the Interior Gale Norton, Director of the National Park Service Fran Mainella, Director of the Fish and Wildlife Service ("FWS") Steven Williams, and Director of the Intermountain Region of the National Park Service Karen Wade are sued in their official capacities, and are collectively referred to as the Federal Defendants.

The International Snowmobile Manufacturers Association, Inc. ("ISMA"), the BlueRibbon Coalition, Inc., and the State of Wyoming intervened as defendants pursuant to this Court's September 15, 2003,

Order. The ISMA is an organization of snowmobile manufacturers whose purpose is promoting the growth of the snowmobiling industry and the snowmobiling sport, as well as providing information to its members, who are manufacturers of snowmobile parts. *See* ISMA and BlueRibbon Mot. to Intervene at 4–5. Blue Ribbon Coalition, Inc., is a non-profit organization representing over 1,000 businesses and organizations who have economic and commercial interests in snowmobile opportunities in the Parks; these members use snowmobiles to access the National Parks. *Id.* at 5–6.

### B. Factual Background and Procedural History

In 1872, Congress established Yellowstone as the nation's first national park, setting aside over 2 million acres for the enjoyment of the public. The Grand Teton National Park was established in 1950, and the John D. Rockefeller Memorial Parkway established in 1972. The use of snowmobiles in the Parks was first permitted in 1963, and in 1968 park administrators, responding to growing concerns about the effects of snowmobiling on park resources, implemented the first official winter-use policy. In 1971, the NPS began grooming snow-covered roads to allow for safe passage by oversnow vehicles, and over the next three decades winter use, including snowmobile use, increased dramatically. Between 1983 and 1993, winter use doubled, increasing from 70,000 visitors per winter season to 140,000 visitors per season. National Park Service, Winter Use Plans Final Environmental Impact Statement at 15 (Oct.2000) ("2000 FEIS"), Administrative Record at 28,415 ("A.R."). Today, over 180 miles of Park roads are groomed at least every other night, and historical use demonstrates that as many as 1700 snowmobiles enter the Parks on peak days. Winter Use Proposed Rule, 68

Fed.Reg. 51,526, 51,533 (proposed August 27, 2003).

### 1. *1997 Litigation and Subsequent Rulemakings*

Inevitably, a conflict arose between the NPS's mandate to protect Park resources and the accommodation of visitors' desires to view the parks via snowmobiles during the winter season. Of particular concern were the effects of trail grooming and snowmobiling on the Parks' wildlife, especially bison. During the winter of 1996–1997, Park officials documented that large numbers of bison left the Parks, some traveling along the manmade groomed trails created to facilitate oversnow vehicle use. As a consequence of this migration, over 1000 bison had to be killed to prevent the spread of brucellosis to livestock in areas outside of the Parks. 2000 FEIS at 16, A.R. 28416. In May of 1997, the Fund for Animals filed suit against the NPS, alleging that the Park's winter use plan, which permitted trail grooming and snowmobile use, violated the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA"). The Fund sought an injunction prohibiting snowmobiling and trail grooming until the Agency prepared an Environmental Impact Statement ("EIS") and consulted with the Fish and Wildlife Service ("FWS") about these activities' impacts on federally protected species.

A Settlement Agreement was reached and approved in 1997 ("1997 Settlement"). The 1997 Settlement provided that the Service would prepare an EIS "addressing a full range of all alternatives for all types of visitor winter use, including snowmobiling and trail grooming . . . and considering the effects of those alternatives on the Parks' environments," and then issue a ROD determining how the winter use policies would be changed. *Id.* ¶ 1. To obtain comparative data and information necessary for preparation of the EIS, the NPS agreed to prepare an environmental assessment ("EA"), and designate as the preferred alternative a proposal closing a trail segment during the 1997–98 winter and closing fourteen additional miles during the winters of 1998–99 and 1999–2000. *Id.* ¶ 6. The Park Service also agreed to prepare a Biological Assessment ("BA") detailing the impact of winter use on the grizzly bear and the gray wolf, and then request a "formal consultation" with the Fish and Wildlife Service.[4] *Id.* ¶ 5. During the EIS preparation, activities under the existing winter use plan would continue. *Id.* ¶ 3. The Court approved the 1997 Settlement in October 1997.

Pursuant to the Settlement Agreement, in 1997 the NPS issued an EA proposing the closure of a groomed road segment, noting that experimental closures would provide more information about how trail grooming affects bison. *See* Environmental Assessment, Temporary Closure of A Winter Road at 30 (Nov.1997) ("EA"), A.R. at 6401. However, in January 1998 the NPS issued a Finding of No Significant Impact ("FONSI") on the grounds that current information did not "sufficiently demonstrate that an immediate closure [of trails] for study would provide the context or range of conditions necessary to make a closure productive." National Park Service Finding of No Significant Impact, Temporary Closure of a Winter Road, at 2 (Jan. 16, 1998) ("FONSI"), A.R. 12,307. As a result, the Park Service decided that, while research concerning wildlife use of

---

**4.** *See* Endangered Species Act, 16 U.S.C. § 1536(a)(2)(2003) (requiring agency consultation with the Fish and Wildlife Service Secretary to insure that any agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species").

groomed trails would continue, this research would not include closing *any* trails to grooming. Plaintiffs subsequently filed a new action alleging that the refusal to close any trails to obtain comparative data was a violation of the 1997 Settlement Agreement, as well as an impediment to completing a comprehensive EIS. This Court found the claims were premature since the EIS was not yet complete, reasoning that "what is not final is whether the decision not to close trails will produce an EIS not in compliance with the settlement agreement and NEPA." Mem. Op., Mar. 31, 1999, at 10.

Per the 1997 Settlement agreement, a Biological Assessment was completed in July 2000, but a formal consultation with the FWS did not follow. Instead, in October 2000, the FWS "concurred" in the conclusion that the proposed action was not likely to adversely affect protected species. *See* National Park Service Biological Assessment of Winter Use Plans at 5 (Mar. 21, 2003), A.R. 71,084.

The Service issued a Draft EIS ("DEIS") on winter use in July of 1999, which contained seven alternatives for snowmobile use and trail grooming. The alternatives ranged from permitting unmitigated snowmobile use to allowing very restricted use, but none of the alternatives in the DEIS contemplated the complete elimination of snowmobiling or the cessation of trail grooming. A Final EIS was issued in October 2000 ("2000 FEIS"), and a ROD signed in November 2000. NPS selected Alternative G, the environmentally preferred alternative, which allowed snowmobile use to continue during the 2000–2001 winter, but called for a complete phase-out of snowmobile use, in favor of snowcoach use,[5] beginning in the winter of 2001–02. Under Alternative G snowmobile use would be completely eliminated by the 2003–04 winter season. *See* Record of Decision, Winter Use Plans, 65 Fed.Reg. 80,-908 (November 22, 2000).

In December of 2000, the Park Service issued a Proposed Rule, which capped snowmobile use in the winters of 2001–02 and 2002–03, and completely eliminated snowmobile use by the 2003–04 winter season. The Service received 5,273 comments during the thirty day public comment period, over 4,300 of these comments supported the proposed phase-out rule. On January 22, 2001, the Park Service published the Final Rule ("Snowcoach Rule" or "2001 Rule"), which allowed snowmobile use to continue in 2001–02, but mandated significant reductions in snowmobile use in 2002–03 and a complete elimination of snowmobile use, in favor of snowcoach use, by the 2003–04 winter season. Neither the Proposed Rule nor the Final Rule made any changes in the groomed trail system, thus allowing trail grooming to continue unabated. *See generally* Snowcoach Rule, 66 Fed.Reg. 7,260 (Jan. 22, 2001).

The 2001 Rule, promulgated by the Clinton administration, was published the day after President George W. Bush took office, and was immediately stayed pending a review of the Rule by the new administration. Final Rule, Delay of Effective Date, 66 Fed.Reg. 8,366 (Jan. 31, 2001). Meanwhile, the 2000 ROD and FEIS were challenged by, among others, the International Snowmobiler Manufacturers Association as an unsupported decision to ban snowmobiling. The lawsuit called for the 2000 ROD and the resulting 2001 Rule to be set aside. In June of 2001, the NPS reached a settlement with the parties, which provided that a Supplemental EIS

---

**5.** Snowcoaches are "self-propelled, mass transit vehicles intended for travel on snow ... having a capacity of at least 8 passengers." *See* Record of Decision, Winter Use Plans, 65 Fed.Reg. 80,908, 80,911 (November 22, 2000).

("SEIS") be prepared. The NPS agreed to consider data on new snowmobile technologies and incorporate "any significant new or additional information or data submitted with respect to a winter use plan." Winter Use Plan Final Rule, 68 Fed.Reg. at 51,527.

Pursuant to the Settlement, in March 2002, the Park Service issued a Draft SEIS ("DSEIS") and a Proposed Rule. The DSEIS examined four alternatives, one of which called for implementing the snowmobile phase-out as detailed in the challenged 2001 Final Rule. During the sixty-day comment period, NPS received over 350,000 pieces of correspondence from the public; over eighty percent of the public comments supported the phase-out of snowmobiles in favor of snowcoaches. Despite this opposition, on November 18, 2002, one month before the phase-out detailed in the Snowcoach Rule was scheduled to go into effect, the Service released a Final Rule delaying the implementation of the phase-out for an additional year. Final Delay Rule, 67 Fed.Reg. at 69,473. Thus, snowmobile use was allowed to continue unabated during the 2002–03 winter season.

In February 2003, the Park Service issued a Final SEIS ("FSEIS" or "2003 SEIS") containing five alternatives. Four alternatives were substantively identical to those in the Draft SEIS; the additional alternative, Alternative 4, was not included in the Draft SEIS. *See* Winter Use Plan Proposed Rule, 68 Fed.Reg. 51,526, 51,527 (proposed Aug. 27, 2003) (explaining the differences between the DSEIS and the FSEIS). FSEIS Alternative 1b, identified as the "environmentally preferred" alternative, paralleled the Snowcoach Rule's Alternative G (the selected alternative), but

deferred implementation of the phase-out for an additional year. FSEIS Alternative 4, the alternative not included in the DSEIS, was identified as the NPS's preferred alternative.[6]

On March 25, 2003, the Park Service signed a ROD ("2003 ROD") largely adopting Alternative 4. In stark contrast to the 2000 ROD and resultant Snowcoach Rule, the 2003 ROD allows 950 snowmobilers to enter the Parks each day. The 2003 ROD further provides that snowmobiles must conform, where possible, with best available technology ("BAT") standards, and also implements a monitoring and "adaptive management" program. The ROD does not provide for any trail closures to facilitate monitoring of trail grooming effects on wildlife, but provides that monitoring will continue. Additionally, beginning in 2003–04, guided passage through the Parks will be required for 80% of snowmobiles. *See generally* National Park Service Winter Use Plans Record of Decision (March 25, 2003) ("2003 ROD"), A.R. 81,461. On August 27, 2003, the Park Service issued a proposed rule to implement the 2003 ROD. Winter Use Plans Proposed Rule, 68 Fed.Reg. 51,526 (proposed August 27, 2003). The Final Rule was published on December 11, 2003. 68 Fed.Reg. 69,268. Neither the Proposed Rule or the Final Rule differed significantly from the 2003 ROD.

### 2. *1999 Rulemaking Petition*

In January of 1999, plaintiff Bluewater and sixty other organizations submitted a Rulemaking petition to the Department of the Interior, seeking regulations that would prohibit trail grooming and snowmobiling in the National Parks. As a result,

---

**6.** A 2002 BA on Alternative 4 found that the alternative was not likely to adversely affect specific protected species. Likewise, on March 21, 2003, the FWS issued a Biological Opinion stating that the Park Service winter-use plan was not likely to adversely affect protected species.

the NPS engaged in a year-long review of the environmental impacts of snowmobiling on the National Parks' resources, culminating in the production of several reports. In April 2000, the Park Service issued an agency memorandum concluding that a favorable response to the Petition was warranted, and finding that "most, if not all, of the recreational snowmobile use now occurring in the National Park System is not in conformity with applicable legal requirements." Mem. from Assistant Sec'y for Fish and Wildlife and Parks at 4 (Apr. 26, 2000) ("Memorandum"). Thus, the Memorandum proposed that "all parks which currently allow recreational snowmobile use under a special regulation ... should repeal these special regulations immediately and halt recreational snowmobile use." *Id.* In late September of 2002, the NPS began preparing a rule to "bring the Service into compliance" with governing regulations, and called for a repeal of the general regulations allowing Parks to promulgate Special Regulations permitting snowmobile use. *See* Draft Proposed Rule, Snowmobile Use Within the National Park System (Sept. 21, 2000), A.R. 60,1059. To date, however, the Proposed Rule has never been issued, and Bluewater has not received a final response as to whether its petition will be granted or denied.

## C. Statutory and Regulatory Framework

In essence, plaintiffs argue that the NPS's decision to allow continued trail grooming and snowmobiling violates the Parks' conservation mandate, as codified in statutes, regulations, executive orders, and management policies. Thus, the Court briefly reviews the major provisions governing the National Parks.

The Park Service Yellowstone Act, the federal statute governing the Agency's administration of Yellowstone Park, requires that the NPS preserve "from injury or spoilation" the "wonders" of the park and insure "their retention in their natural condition." 16 U.S.C. § 22 (2003). The Secretary is also required to "provide against the wanton destruction of the fish and game found within the park, and against their capture or destruction for the purposes of merchandise or profit." *Id.*

The Organic Act, creating the National Park Service, defines the Service's purpose as "conserv[ing] the scenery and the natural and historic objects and the wild-life therein and ... provid[ing] for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1 (2003).

Two Executive Orders specifically address the use of snowmobiles in the Parks. Executive Order 11644, signed by President Nixon in 1972, established procedures for controlling the use of off-road vehicles, specifically including snowmobiles, on public lands. The Executive Order mandated that each agency establish regulations designating specific zones of use for off-road vehicles, and that such chosen areas be located to "minimize harassment of wildlife and significant disruption of wildlife habitats." Exec. Order No. 11644, 37 Fed. Reg. 2877 (Feb. 8, 1972). Executive Order 11989, signed by President Carter in 1977, amended and strengthened the 1972 Order, stating that if an agency head determines that the use of off-road vehicles will cause "considerable adverse effects on the soil, vegetation, wildlife, wildlife habitat or cultural or historic resources of particular areas or trails of the public lands" the agency head shall "immediately close such areas or trails to off-road vehicles." Exec. Order No. 11989, 42 Fed.Reg. 26,959 (May 24,1977).

NPS regulations prohibit the disturbance of any wildlife from their "natural state." National Park Service, Resource Protection, Public Use and Recreation,

Snowmobiles, 36 C.F.R. § 2.18(a)(1)(i)(2003). The regulations also sharply limit the use of snowmobiles in the Parks, stating that "[s]nowmobiles are prohibited except where designated and only when their use is consistent with the park's natural, cultural, scenic and aesthetic values, safety considerations, and park management objectives, and will not disturb wildlife or damage park resources." 36 C.F.R. § 2.18(c).

The National Park Service's Management Policies, which interpret the above directives, designate the Organic Act as "the most important statutory directive for the National Park Service." National Park Service 2001 Management Policies at 1.4.1 ("NPS Policies"), A.R. 85,318. The NPS's official interpretation of the Act notes that it embodies *both* a non-impairment requirement and a broader conservation mandate, thus noting that the conservation mandate "applies all the time, with respect to all park resources and values, *even when there is no risk that any park resources or values may be impaired.*" NPS Policies at 1.4.3, A.R. 85,318 (emphasis added). This mandate is further interpreted to require protection of "[t]he parks' scenery . . . wildlife, and the processes and conditions that sustain them . . . including the ecological, biological, and physical processes that created the park . . . natural visibility . . . water and air resources . . . and native plants and animals." NPS Policies at 1.4.6, A.R. 85,318. Thus, the Agency interpretation of its mandate under the Organic Act requires NPS managers to "always seek to avoid, or minimize to the greatest degree practicable, adverse impacts on park resources and values." NPS Policies at 1.4.3, A.R. 85,318. Finally, the 2001 Management Policies recognize that the Agency must provide for the public enjoyment of the Parks, but, adopting judicial interpretations of the Organic Act, note that "when there is a conflict between conserving resources and values and providing for enjoyment of them, conservation is to be predominant." *Id.*

The Endangered Species Act ("ESA") requires agencies to consult with the Fish and Wildlife ("FWS") Secretary to insure that any agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2)(2003). Further, if the FWS determines that a listed species may be present in the area of proposed agency action, the agency must "conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." 16 U.S.C. § 1536(c).

The National Environmental Policy Act ("NEPA") requires that, before an agency takes action that significantly affects the environment, the agency prepare an Environmental Impact Statement ("EIS") evaluating the impacts of the action, as well as identifying and evaluating alternatives to the proposed action. 42 U.S.C. § 4332(c)(2003). Consideration of alternatives is "the heart of the environmental impact statement." Environmental Impact Statement, 40 C.F.R. § 1502.14 (2003). The EIS must:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail. . . .

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e)Identify the agency's preferred alternative or alternatives, if one or more exists . . . .

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

*Id.* When information is "essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement." Environmental Impact Statement, 40 C.F.R. § 1502.22(a)(2003).

## II. Standard of Review

### A. Summary Judgment

This case is before the Court on the parties' cross motions for summary judgment. Pursuant to Federal Rule of Civil Procedure Rule 56, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See Fed.R.Civ.P. 56; Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Aka v. Washington Hosp. Ctr.,* 116 F.3d 876, 879 (D.C.Cir. 1997), *reh'g en banc granted,* 124 F.3d 1302 (1997). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran,* 517 F.2d 66, 67 (2d Cir.1975). Courts in this Circuit have repeatedly recognized that summary judgment is an appropriate procedure when a court reviews an agency's administrative record. *See, e.g., Bloch v. Powell,* 227 F.Supp.2d 25, 30–31 (D.D.C.2002) (citing *Fund for Animals v. Babbitt,* 903 F.Supp. 96, 105 (D.D.C.1995)).

### B. Administrative Review

■ The Administrative Procedure Act ("APA") authorizes courts to set aside agency actions which are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In reviewing an agency's action, the court must engage in a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). However, while the Court's inquiry must be "searching and careful," the standard of review is also a highly deferential one; the agency's actions are "entitled to a presumption of regularity," and the court cannot "substitute its judgment for that of the agency." *Id.* at 415–16, 91 S.Ct. 814.

■ Plaintiffs correctly point, however, to a slight wrinkle in the well-settled law defining a court's deferential review. When, as here, an agency reverses an earlier decision by revoking or staying an existing regulation, the agency is "obligated to supply a reasoned analysis for the change *beyond that which may be required when an agency does not act in the first instance.*" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 41–42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (emphasis added). Thus, while the court's review is still a deferential one, in order to withstand judicial scrutiny the agency record must demonstrate that "prior precedents and standards are being deliberately changed, not casually ignored." *Bush–Quayle '92 Primary Committee, Inc. v. Federal Election Com'n,* 104 F.3d 448, 453 (D.C.Cir.1997) (internal quotations and citation omitted). Failure to do so requires the court to set aside the new agency action. *See Louisiana Public Service Com'n v. F.E.R.C.,* 184 F.3d 892, 897 (D.C.Cir.1999) ("For the agency to reverse its position in the face of a precedent it has not persuasively distinguished is quintessentially arbitrary and capricious.").

## III. DISCUSSION

### A. The National Park Service's 2001 Final Rule and 2003 Final Rule

■ The Court is faced with the review of an agency decision that amounts to a 180 degree reversal from a decision on the same issue made by a previous administration. The 2001 Snowcoach Rule, explicitly citing the negative environmental impacts of snowmobiling on the resources and wildlife of the National Parks, mandated that snowmobiling be phased out in favor of snowcoaches. Three years later, at the exact time this phase-out was to be complete, the Court now reviews a newly promulgated rule which allows 950 snowmobiles to enter the Parks each day.

■ This dramatic change in course, in a relatively short period of time and conspicuously timed with the change in administrations, represents precisely the "reversal of the agency's views" that triggers an agency's responsibility to supply a reasoned explanation for the change. *State Farm*, 463 U.S. at 41, 103 S.Ct. 2856; *see also Amax Land Co. v. Quarterman*, 181 F.3d 1356, 1365 (D.C.Cir.1999) (adopting the *State Farm* rationale). While the Snowcoach Rule was not a rule of longstanding, as it was immediately stayed by the incoming Bush Administration, the process leading to the phase-out decision was lengthy, complex, and complete: the Snowcoach Final Rule was promulgated after almost a decade of study, followed by

a complete notice and comment rulemaking process, and was ultimately published in the Federal Register. Thus, because there is a "presumption that ... policies will be carried out best if the settled rule is adhered to," the NPS is charged with fully explaining the need for, and identifying the record evidence supporting, this change in course. *State Farm*, 463 U.S. at 41–43, 103 S.Ct. 2856 (internal quotations and citation omitted).[7]

■■ Moreover, an explanation for this abrupt change, and the court's review of that change, must be made in view of the statutory mandate that governs the agency's actions. Here, as reviewed *supra*, and duly recognized by the NPS in the 2003 ROD, NPS is bound by a conservation mandate, and that mandate trumps all other considerations. 2003 ROD at 18, A.R. 81,479 ("Congress has provided that when there is a conflict between conserving resources and value [in the Parks] and providing for enjoyment of them, *conservation is to be the primary concern.*"); *see also Nat'l Rifle Assoc. of Am. v. Potter*, 628 F.Supp. 903, 909 (D.D.C.1986) ("In the Organic Act Congress speaks of but a single purpose, namely, conservation."). The NPS's Management Policies offer the best interpretation of its mandate, and they are similarly explicit: NPS managers "must always seek to avoid, or minimize to the greatest degree practicable, adverse impacts on park resources and values." NPS Polices at 1.4.3, A.R. 85,318.[8] Finally, with

7. The Court does not question the initial decision to develop the SEIS, as it was clearly the result of the 2001 Settlement reached with the ISMA. 68 Fed.Reg. at 69,268. Rather, the Court seeks an explanation for the change in course that resulted from this new NEPA process; namely, the decision to again allow snowmobile use in the parks.

8. Defendants argue that their own Management Policies are not binding on them. This argument fails on two fronts. First, the NPS

continually relied on the Management Polices throughout the rulemaking process. *See, e.g.,* 2003 ROD at 19–20, A.R. 81,480–481 (devoting two pages to explaining the Management Policies in the "Legal Framework" Section of the ROD). Post-hoc arguments by NPS's counsel cannot negate this reliance. Second, this Circuit utilizes an "intent to be bound" test to determine whether such policies are binding. *See Davis v. Latschar*, 202 F.3d 359 (D.C.Cir.2000) (finding agency policies binding, and noting that whether the Park Service

regard to snowmobile use in the National Parks, two Executive Orders, as well as NPS regulations, demand that if it is determined that snowmobile use has an adverse effect on the Park's resources, or disturbs wildlife, the snowmobile use must immediately cease. 36 C.F.R. § 2.18(c); Exec. Order No. 11644, § 3(2); Exec. Order No. 11989, § 2.

In 2000–01 the NPS faced the question of whether to permit snowmobile use in the National Parks, and concluded in the ROD that the elimination of snowmobiling in favor of snowcoach use was the "best way to comply with applicable legal requirements." Snowcoach Final Rule, 66 Fed.Reg. 7,260 (Jan. 22, 2001). The 2000 ROD explicitly acknowledged that "there are overall adverse impacts associated with snowmobile use in the parks," and that "snowmobile use at current levels adversely affects wildlife, air quality, and natural soundscapes and natural odors." 65 Fed. Reg. at 80,915. These impacts were deemed to rise to the level of "impairment" of the Parks' resources and values, thus violating the Organic Act. 65 Fed. Reg. at 80,916. Consequently, the 2000 ROD concluded that "elimination of these impacts is most easily and most effectively accomplished by eliminating snowmobile use." 65 Fed.Reg. at 80,915.

Less than three years later, while acknowledging that the 2001 Snowcoach Rule was based on a finding that existing snowmobile use "impaired park resources and values, thus violating the statutory mandate of the NPS," the NPS has decided to allow 950 snowmobiles to enter the Parks each day. 68 Fed.Reg. at 69,268; 68 Fed.Reg. at 51,533. Defendants have

continually explained that the decision to now allow snowmobiling is based on the availability of "cleaner, quieter snowmobiles," largely due to the transition from two-stroke snowmobiles to four-stroke snowmobiles and the implementation of Best Available Technology ("BAT") requirements. See 2003 ROD at 3, A.R. 81,464 ("The selected alternative emphasizes cleaner, quieter access to the parks using the technologies commercially available today and calls for improvements in the future."); Id. at 14, A.R. 81,475 (noting that manufacturers have made "significant improvements at reducing air and noise emissions"); see Tr. Hr'g, Nov. 20, 2003, at 71 (NPS counsel explaining that there have been "significant technological developments" during the time between the 2001 Snowcoach Rule and the 2003 ROD).

However, the prospect of improved technology is not "new." The possibility of improved technology was explicitly considered in the 2000 ROD, and just as explicitly rejected as an inadequate solution for reducing the negative impacts of snowmobiling. Explaining the need for a complete phase-out of snowmobiles, the 2001 Snowcoach Rule states: "Some newer snowmobiles have promise for reducing some impacts, but not enough for the use of large numbers of those machines to be consistent with the applicable legal requirements. *Cleaner, quieter snowmobiles would do little, if anything, to reduce the most serious impacts on wildlife.*" 66 Fed.Reg. at 7,260 (emphasis added). Significantly, this conclusion was never found to be erroneous, as the 2000 EIS and ROD were expressly adopted during the 2003 rulemaking process. *See* 2003 ROD at 7,

---

is bound by its Management Policies turns on "the agency's intent to be bound"). Here, an intent to be bound is clear, as these polices were not simply internal, informal guidelines. Rather, they were promulgated through an actual public comment process, and were further noted in the Federal Register as the

"official interpretation" of the Organic Act. Notice of Availability of Draft National Park Service Management Policies, 65 Fed.Reg. 2,984 (Jan. 19, 2000); Notice of New Policy Interpreting the National Park Service (NPS) Organic Act, 65 Fed.Reg. 56,003 (Sept. 15, 2000).

n. 3, A.R. 81,468 ("The SEIS is a supplement to the Final EIS, and the context in which it is written is the acceptance of new data, *not that the Final EIS and ROD are incorrect.*") (emphasis added). Further, the accuracy of the technological projections made in 2000, and the applicability in 2003, is recognized by the Environmental Protection Agency; in comments submitted to the NPS during the current rulemaking process, the EPA affirms that technological projections made in 2000 were accurate, and concludes that, even with new technology, a phase-out of snowmobile use is still necessary. *See* National Park Service, Winter Use Plans Final Supplemental Environmental Impact Statement, Vol. 2 at 26 (Feb.2003) ("FSEIS"), A.R. 74,587 ("FEIS Alternatives B and D were remarkably accurate in setting and analyzing emissions objectives that could be achieved by the new technology."). Thus, even taking into account the possibility of "cleaner, quieter" snowmobiles, the NPS concluded in 2001 that, in order to comply with governing law, snowmobiles must be eliminated.[9]

The NPS also posits that the use of guided group tours will mitigate snowmobiler interaction with wildlife, and that limiting entries to 950 snowmobiles per day will greatly reduce the negative impacts of snowmobiles. *See generally* 2003 ROD at 11–16; A.R. 81,472–77. However, these mitigation measures are significantly flawed. First, the daily "limits" touted by the NPS do not actually appear to reduce snowmobile use, as the 2003 ROD notes that the limits will only "ensure use does not exceed the current average throughout the West Entrances" and actually "allow for modest *increases* at the other entrances and road segments." 2003 ROD at 11, A.R. 81,472 (emphasis added). Further, the requirements that snowmobilers travel in groups, under the theory that this will lessen interaction with wildlife, is essentially eliminated in the 2003 Final Rule, as the "group" size is defined as "1–11 snowmobiles." 68 Fed.Reg. at 69,274. Thus, the Rule continues to allow for snowmobilers to travel alone, thereby eliminating the benefit of "group" travel. Finally, the Final Rule acknowledges the inherent flaws in a tour-guide system, noting that, even between passengers *on the same machine,* it is "very difficult if not impossible to communicate with the driver over the noise of a snowmobile." 68 Fed. Reg. at 69,275. Given that the Final Rule only requires snowmobilers to stay within one-third of a mile of the first snowmobiler in the group (presumably the guide), these oral communication difficulties apply with equal force. 68 Fed.Reg. at 69,275.[10]

■ The gap between the decision made in 2001, and the decision made in 2003 is stark. In 2001, the rulemaking process culminated in a finding that snowmobiling so adversely impacted the wildlife and resources of the Parks that all snowmobile use must be halted. A scant three years later, the rulemaking process culminated in the conclusion that nearly one thousand snowmobiles will be allowed to enter the

---

9. The likelihood of continued technological improvements, and reliance on the snowmobile industry for these improvements, was a prominent theme in the 2003 ROD. *See* 2003 ROD at 21, A.R. 81,482 ("As the industry has promised, I expect snowmobile technology to continue to improve, which will further reduce adverse impacts to air quality."). However, this reliance may not be well-placed, as the 2003 Final Rule admits that "some snowmobiles' emissions in the 2004 model year have *increased* slightly since the 2002 model year." 68 Fed.Reg. at 69,269 (emphasis added).

10. Defendants assert that communication will occur via hand signals, but given the allowance of a one-third of a mile gap between the guide and a snowmobiler, the efficacy of this method of communication is also questionable.

park each day. In 2001, the NPS selected the "environmentally preferred alternative." In 2003, the NPS rejected the environmentally preferred alternative, and instead chose an alternative whose "primary beneficiaries" are the "park visitors who ride snowmobiles in the parks and the businesses that serve them." 68 Fed.Reg. at 69,279. In light of its clear conservation mandate, and the previous conclusion that snowmobile use amounted to unlawful impairment, the Agency is under an obligation to explain this 180 degree reversal. NPS has not met this obligation.[11] NPS's explanation that technological improvements and mitigation measures justify this change has, as noted above, proven weak at best. In "swerv[ing] from prior precedents" without a cogent, supported explanation, the agency has "crossed the line from the tolerably terse to the intolerably mute." *Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 844 (D.C.Cir.1970). An agency decision codifying such an unreasoned change is "quintessentially arbitrary and capricious," and thus cannot stand. *Louisiana Public Service Com'n,* 184 F.3d at 897. Therefore, the Court remands the 2003 SEIS and ROD to the agency for further consideration not inconsistent with this opinion.[12]

## B. National Environmental Policy Act Claims

### 1. *Fund For Animals NEPA Claims* [13]

 Fund Plaintiffs allege that the failure to include an alternative considering the cessation of trail grooming in the 2003 SEIS violates NEPA's mandate that an agency must consider a full range of alternatives to any proposed action likely to impact the environment.[14] This failure,

11. Indeed, there is evidence in the Record that there *isn't* an explanation for this change, and that the SEIS was completely politically driven and result oriented. *See* NPS Meeting Agenda for June 3, A.R. 51,392 (defining the "internal objective" as "to determine under what terms and conditions snowmobiling will continue in the three parks," and the external objective as "whether to affirm the previous decision or to make a new one."); A.R. 51,-416 (participant in NPS meeting noting that "Gale Norton wants to be able to come away *saying some snowmobiles are allowed.*").

12. Because the Court remands on the grounds that the agency reversal in position was arbitrary and capricious, the Court need not reach Plaintiffs' Organic Act and Endangered Species Act claims.

13. The Fund plaintiffs also allege that the failure to prepare a comprehensive SEIS also violates the 1997 Settlement Agreement. *See* 1997 Settlement ¶ 1 (agreeing that the NPS would prepare an EIS "addressing a full range of all alternatives for all types of visitor winter use, including snowmobiling and trail grooming ... and considering the effects of those alternatives on the Parks' environment."). Because the Court has determined that the 2003 SEIS is not in compliance with NEPA, and thus remands on that issue, it

need not reach the 1997 Settlement Agreement claim.

14. Fund plaintiffs further allege that the selection of Alternative 4 violates NEPA, as that alternative was not included in the Draft SEIS and thus was not subject to public comment until after the issuance of the ROD. While the Court notes that this disregard for public input has been the NPS's *modus operandi* throughout the rulemaking process, evidenced most clearly by the selection of an alternative in the Final Rule that 91% of public comments opposed as not adequately protecting the environment, this does not amount to a NEPA violation. 68 Fed.Reg. at 69,269. Thus, while viewing the agency's actions with scepticism, the Court is persuaded by NPS' argument that the SEIS Alternative 4, while not included as a distinct alternative in the Draft SEIS, was in fact reviewed by the public because its component parts were included as parts of other alternatives that were included in the DSEIS. *See* Tr. Hr'g, Nov. 20, 2003, at 71. Further, the public did have the chance to comment on the selected alternative after it was published in the Proposed Rule, and over 100,000 commentators took advantage of this opportunity. While surely not the best practice to shore up public confidence, especially given the fact that the Draft

plaintiffs allege, renders the agency's selection of Alternative 4 arbitrary and capricious. The Court agrees.

■■■■ As an initial matter, the Court notes that NEPA's mandate is essentially a procedural one: it requires that agencies contemplating an action likely to significantly affect the environment take a "hard look at the environmental consequences" before taking that action. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *see also Valley Community Preservation Com'n v. Mineta*, 231 F.Supp.2d 23, 39 (D.D.C.2002). This "hard look" is accomplished by the preparation of an "environmental impact statement," in which an agency must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 42 U.S.C. § 4332(c). However, an agency "need not consider all possible alternatives for a given action, nor must the agency select any particular alternative." *Sierra Club v. Watkins*, 808 F.Supp. 852, 872 (D.D.C. 1991). Thus, a court's role in reviewing a NEPA challenge is confined to ensuring that an agency "has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas*, 462 U.S. at 98, 103 S.Ct. 2246.

Defendants argue that the SEIS and the 2003 ROD reflect the "hard look" required by NEPA, and that the environmental impacts of each alternative were examined in "painstaking detail," as evidenced by the 100 pages in the SEIS devoted to the impacts of each alternative. Fed. Defs.' Cross Mot. for Summ. J at 29. However, defendants entirely miss the point that *not one of these alternatives actually proposed or considered the cessation of trail grooming.* FSEIS at 499 ("NPS did not have another opportunity in the SEIS to ... evaluate a 'no access-no grooming' alternative.").[15] In light of the fact that "the use of groomed surfaces and their impacts on wildlife" was identified as one of the "major issues" to be considered in the SEIS, it defies logic that an option considering the cessation of trail grooming was not considered.

■■■■ While plaintiffs "cannot simply throw out innumerable alternatives to waste the agency's time," the agency is under an obligation to consider a *full range* of alternatives. *Sierra Club v. Watkins*, 808 F.Supp. 852, 872–75 (D.D.C.1991) (emphasis added); Environmental Impact Statement, 40 C.F.R. § 1502.14 (2003)

SEIS generated over 350,000 public comments, the non-inclusion of Alternative 4 does not amount to a NEPA violation. *See* 68 Fed.Reg. at 69,268 (detailing public comments).

15. Given that the 2003 SEIS was supplemental to the 2000 EIS, defendants raise the argument that trail closures were considered in the 2000 EIS. However, only one alternative in the EIS considered any trail closures at all, and that alternative would have left approximately seventy percent of roads open to grooming. *See* 2000 EIS at 52, A.R. 28,452, 28,778. The possibility of discontinuing the grooming of more trails was "eliminated from detailed study." 2000 EIS at 63, A.R. 28,463. Moreover, it is clear that the NPS was not, during the 2003 rulemaking, choosing from among all of the former EIS alternatives as well as the new SEIS alternatives. The NPS deliberately chose to include only one of the alternatives from the original EIS in the new process, the 2001 selected Alternative G, and that alternative did not call for the cessation of any trail grooming. Thus, the decision the NPS faced in 2003 was only a choice among the listed alternatives in the SEIS, none of which call for discontinuing trail grooming. Indeed, the SEIS itself characterizes the decision to be made as "whether to affirm the previous decision [by selecting Alternative 1b, which is the selected Alternative G from 2001] or to make a new one," not a decision reconsidering all of the EIS alternatives. 2003 SEIS at S–3.

(consideration of a full range of alternatives is "the heart of the environmental impact statement."). Here, the administrative record is ripe with studies indicating that winter park use, and especially trail grooming, has lead to major changes in bison migration patterns. *See, e.g.,* Mary Meagher, Recent Changes in Yellowstone Bison Numbers and Distribution, A.R. 5,329 (noting that bison distribution patters "changed drastically", and that one of the "major factors driv[ing] the changes" is the existence of "snow-packed interior winter roads"); Mary Meagher, Winter Recreation–Induced Changes in Bison Numbers and Distribution in Yellowstone National Park, A.R. 5,345 (the existence of snow-packed roads is "the major influence" for major changes in bison migration). Yet, in the face of this highly relevant evidence, none of the SEIS alternatives proposed a cessation of trail grooming.

 To be sure, the NPS points to several studies disputing Dr. Meagher's conclusions, namely the Bjornlie and Garrott survey finding that bison make only minimal use of the groomed roads, and that the use of the trails actually conserves energy output for the bison. *See* Daniel Bjornlie and Robert A. Garrott, Effects of Winter Road Grooming on Bison in Yellowstone National Park (2001), A.R. 84,835–84,847. Defendants thus conclude that this valid disagreement between experts saves its decision not to include a grooming cessation option from running afoul of NEPA, as "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Fund for Animals v. Williams,* 246 F.Supp.2d 27, 46 (D.D.C.2003) (quoting *Sierra Club v. Watkins,* 808 F.Supp. 852, 862 (D.D.C. 1991)). While not stated in the Record, the NPS apparently decided to credit certain experts over others, and such a choice would certainly be within the agency's discretion. However, when making such a decision, the agency "must cogently explain *why* it has exercised its discretion in a given manner." *State Farm,* 463 U.S. at 52, 103 S.Ct. 2856 (emphasis added). Moreover, as this Circuit has made abundantly clear, factual uncertainty does not give the agency decision-maker carte blanche to make unsupported choices. Rather, faced with conflicting evidence, the decision-maker must "identify the considerations he found persuasive." *Small Refiner Lead Phase–Down Task Force v. U.S.E.P.A.,* 705 F.2d 506, 520 (D.C.Cir. 1983) (internal quotations and citation omitted). Defendants have failed to point to any explanation in the record as to why NPS apparently chose to credit one expert over another. Thus, in light of the agency's mandate to protect the parks, the Court is at a loss to understand the agency decision.

Further, while inconclusive evidence may serve as justification for not *choosing* an alternative, here it cannot serve as a justification for entirely failing to "rigorously explore and objectively evaluate *all* reasonable alternatives." Environmental Impact Statement, 40 C.F.R. § 1502.14(a). Rather, the conclusion that "it is *unknown* if and to what extent beneficial effects [of trail grooming] outweigh negative effects on bison movement" screams out for further study. 2003 SEIS at 201, A.R. 76,513 (emphasis added). As NEPA's implementing regulations make clear, when there is "information relevant to reasonable foreseeable significant adverse impacts," and that information is "essential to a reasoned choice among alternatives," the agency "shall include the information" unless "the overall costs of obtaining it are exorbitant or the means to obtain it are not known." Environmental Impact Statement, 40 C.F.R. § 1502.22 (2003).

The NPS has never cited expense as an overriding consideration, nor has it ever stated that it does not know how to obtain the necessary data. It is thus particularly damning that the NPS has *failed to close a single road to trail grooming,* and consequently has never been able to engage in any true comparative analysis, and gather the resultant necessary data, of the effects of trail grooming on bison and other wildlife. As the Environmental Assessment of Temporary Road Closure stated, a "winter road closure would provide useful information to researchers attempting to understand if a link between the groomed roads and wildlife movement exists." EA at Summary, A.R. 6,369. Further, the EIS itself noted that, without trail closures, the agency simply cannot "comparatively assess the effects of groomed winter roads on wildlife." 2000 FEIS at 47, A.R. 6418. Thus, this failure to even consider taking the steps necessary to gather relevant information results in an incomplete EIS analysis, as NEPA's very purpose is to ensure that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

The agency offers nothing more than a terse dismissal of why the closure of trails was not considered, and its response to the public comments that the rule fails to address trail grooming are indicative of NPS's curt responses: "the NPS believes the evidence of whether or not road grooming is affecting bison distribution and abundance is inconclusive." 68 Fed. Reg. at 69,277. This conclusion, wholly devoid of analysis, does not pass muster, as the NPS has an obligation to "respond meaningfully" to the evidence concerning the environmental impacts of trail grooming, "for unless an agency answers objections that on their face appear to be legitimate, its decision can hardly be said to be reasoned." *KeySpan–Ravenswood, LLC v. F.E.R.C.,* 348 F.3d 1053, 1056 (D.C.Cir. 2003); *see also Alaska Wilderness Recreation v. Morrison,* 67 F.3d 723, 729 (9th Cir.1995) ("The existence of a viable but unexamined alternative renders an environmental impact statement inadequate.").

When the question an agency faces is whether winter use activities violate the clear mandate to conserve the wonders of the national parks, ample evidence that bison are adversely affected by trail grooming is highly relevant, and thus cannot be excluded from a NEPA analysis without a cogent explanation. The decision, codified in the 2003 ROD and the Final Rule, to continue to pack the road system without even considering trail closures, and without putting forth a clear rationale for this failure, renders the SEIS flatly inadequate under NEPA.[16]

### 2. Yellowstone Plaintiffs' NEPA Claims

The Yellowstone plaintiffs' NEPA argument rests on narrower grounds. Essentially, plaintiffs argue that during the SEIS process, the NPS did not properly evaluate levels of pollution caused by snowmobiles, and did not consider elevated

---

**16.** The Fund plaintiffs also allege that permitting trail grooming violates the Yellowstone Act, the Organic Act, Executive Orders, and the NPS's own management policies. However, the very nature of a NEPA violation precludes the Court from reaching these arguments. Precisely because of the NPS's failure to truly consider trail closures, the Court does not have the necessary information, such as comparative data from groomed and nongroomed trails, to determine whether trail grooming violates statutory conservation mandates. Accordingly, the Court's remand as to the trail grooming issue is on NEPA grounds.

risks for the Park's most susceptible visitors and employees. Predictably, defendants counter that both of these concerns were thoroughly considered, and that the resultant SEIS is in full compliance with NEPA requirements.

■ The cornerstone of plaintiffs' claim that possible levels of air pollution from snowmobile emissions were not properly evaluated is that NPS failed to model particulate matter under 2.5 microns in size (PM 2.5). NPS counters that it modeled particulate matter at the PM 10 level, which serves as a proxy for measuring at the PM 2.5 level. The parties' briefs, each supported by conflicting scientific evidence, engage in a back and forth as to which scientific method more accurately detects fine particulate matter.

■ A battle over proper scientific methodology is not a fight into which the Court can properly intervene. As more fully explained above, NEPA's procedural mandate requires that agencies consider a full range of alternatives, and the environmental effects of implementing each alternative, before taking any action that could significantly affect the environment. Absent an agency's blatant use of an unscientific or discredited method of evaluation, it is the agency, not the Court, who is "entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances." *Sierra Club v. U.S. Dept. of Transp.*, 753 F.2d 120, 129 (D.C.Cir.1985). Thus, the Court finds that it is well within the agency's discretion to choose an air particulate modeling method, and NPS's choice does not render it in violation of NEPA.

■ The Yellowstone plaintiffs further argue that, with regard to air pollutants, the agency failed to evaluate elevated risks to pregnant women, children, and elderly visitors. However, as the NPS counters, the SEIS devoted a full sub-part to public health and safety, and another full part to employee health and safety, and included those with increased health risks in the analysis. *See, e.g.,* 2003 SEIS 114–15, 187–195. The Court shares plaintiffs' concerns that the gravity of the health risks identified may not be able to be squared with the decision to allow continued snowmobiling, and this disparity may well implicate other statutes. However, it is clear that the NPS did at least fully consider health risks to susceptible populations, and under NEPA the evaluation of alternatives and risks is all that is required. It is a breakdown in procedure, rather than disagreement with the decision reached, which forms the basis of a NEPA claim. *See Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 737, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998); *see also Grand Council of Crees v. F.E.R.C.,* 198 F.3d 950, 959 (D.C.Cir.2000) (NEPA " 'does not impose substantive duties mandating particular results, but simply prescribes the necessary process for preventing uninformed—rather than unwise— agency action.' ") (*quoting Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 333, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). Accordingly, the Court finds that the agency's analysis of health risks to susceptible populations does not render it in violation of NEPA.

## C. The 1999 Rulemaking Petition

■ Finally, the Fund plaintiffs argue that defendants' failure to respond to Bluewater Network's 1999 Rulemaking Petition seeking regulations prohibiting snowmobiling and trail grooming throughout the entire National Park System amounts to unreasonably delayed agency action in violation of 5 U.S.C. §§ 555(b) and 706(1). Pursuant to the APA, an agency must "conclude" a matter presented to it "within a reasonable time." 5

U.S.C. § 555(b) (2003). If agency action is "unlawfully withheld or unreasonably delayed," a reviewing court is authorized to compel agency action. 5 U.S.C. § 706(1); *see also Mashpee Wampanoag Tribal Council v. Norton,* 336 F.3d 1094, 1099–1100 (D.C.Cir.2003). In determining whether an agency has unreasonably delayed action, this Circuit looks to the following criteria for guidance:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) ... [the] statutory scheme may supply content for this rule of reason; (3) delays ... are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re Bluewater Network,* 234 F.3d 1305, 1315 (D.C.Cir.2000) (internal citations and quotation omitted); *see also Mashpee,* 336 F.3d at 1101. Given the admittedly vague nature of these factors, this Circuit has recognized that resolution of unreasonable delay claims is often "a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court." *Id.*

The above factors make clear that an analysis of whether unreasonable delay has occurred is heavily dependent on the statutory context. As discussed extensively *supra,* the NPS' conservation command could not be more clear: the NPS is absolutely charged with preserving the natural wonders of the Parks. Indeed, the NPS itself officially interprets its Organic Act mandate to require that NPS managers "*always* seek to avoid, or minimize *to the greatest degree practicable,* adverse im-

pacts on park resources and values." NPS Polices at 1.4.3 (emphasis added).

In recognition of this clear mandate, the initial response to the 1999 Petition stated that because "recreational use of snowmobiles in our national parks *is capable of disturbing wildlife, polluting the air and water of the parks, [and] exceeding the service-wide noise standards* ... most, if not all, of the recreational snowmobile use now occurring in the National Park System *is not in conformity with applicable legal requirements,*" and recommended that recreational snowmobile use be immediately halted. Assistant Sec'y for Fish and Wildlife and Parks Mem., Apr. 26, 2000, at 1–4, A.R. 60,076 (emphasis added). Yet, despite the NPS's conservation mandate and the initial recognition that allowing snowmobiling ran afoul of that mandate, the stark reality is that, in the absence of an answer, snowmobiling has continued unabated during the five years since the petition was filed.

While the APA does not set clear temporal boundaries defining "unreasonable delay," a *five year* delay smacks of unreasonableness on it face. Indeed, this Circuit has indicated that "a reasonable time for an agency decision could encompass 'months, occasionally a year or two, but not several years or a decade.'" *Midwest Gas Users Ass'n v. F.E.R.C.,* 833 F.2d 341, 359 (D.C.Cir.1987) (quoting *MCI Telecommunications Corp. v. F.C.C.,* 627 F.2d 322, 340 (D.C.Cir.1980)). Defendants counter that the delay is reasonable and within their broad discretion to determine policy priorities. Specifically, defendants argue that, in light of advances in snowmobile technology as well as the pressures of intervening litigation, NPS continues to analyze the issue. Moreover, federal defendants state that the decision reached with regard to Yellowstone (per the Final Rule) could well serve as a model for parks

nationwide.[17] Given these competing concerns, defendants rely on *Cobell v. Norton* for the assertion that courts should not compel agency action unless a delay is "egregious." *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C.Cir.2001).

■■■ While the Court heeds this wise caution against interference with agency discretion, it also notes that deference "does not require courts to turn a blind eye when government officials fail to discharge their duties." *Id.* (affirming finding that agency delay was unreasonable). As in *Cobell*, this court cannot turn a blind eye to the factual realities, nor the NPS's obligations, in the instant action. The 1999 Petition documents numerous studies finding unacceptable levels of air pollution, traced to snowmobile engine emissions, in the parks. For example, one study found that carbon monoxide levels in some areas of Yellowstone were higher than that in the *city* of Los Angeles. Bluewater Network 1999 Rulemaking Petition at 2, A.R. 21,593. Perhaps most startling is the record evidence that at existing levels of snowmobiling, the air quality in some park areas is so toxic that park rangers are forced to wear respirators *to simply do their jobs in a national park*-arguably the last place that air quality should prove to be an occupational hazard. NPS simply cannot debate that pressing human health concerns, as well as the possibility of grave environmental damage, demand prompt review.

Further, because the 1999 Petition challenges snowmobiling *throughout* the entire Park System, it applies to the park units that will not be affected by the 2003 Final Rule. Thus, the current conditions in the parks not subject to the Final Rule will remain, and these may well be the very conditions that the NPS fully admits necessitated the Final Rule for Yellowstone. Given that when the impacts of snowmobiling were actually considered in Yellowstone, the NPS found that snowmobile use impacted Park air quality and wildlife to such a level so as to constitute unlawful "impairment," it is clear that the impacts of snowmobiling in other parks could also be severe. 2003 ROD at 20–21, A.R. 81,-481–82.

NPS's assertions that the delay is reasonable because it continues to study the issue, and that it is prioritizing myriad responsibilities (including intervening litigation on several fronts), are not without merit. The Court is also aware that collecting evidence for the entire Park system will likely be a lengthy process. However, when balanced against the applicable statutory scheme, namely the Organic Act, it is clear that the failure to take *any* action since the initial favorable response cannot be squared with the need to protect the parks. Quite simply, NPS's conservation mandate can rarely be trumped by other considerations. As the 2003 ROD unequivocally acknowledges, "Congress has provided that when there is a conflict between conserving resources and value and providing for enjoyment of them, *conservation is to be the primary concern.*" 2003 ROD at 18; *see also Edmonds v. Babbitt*, 42 F.Supp.2d 1, 16 (D.D.C.1999) (noting the "primary purpose" of the Organic Act is "the conservation of wildlife resources.") (collecting cases).

Thus, in light of NPS's clear charge to protect the wonders of the National Parks, coupled with the fact that during the ongo-

---

17. Intervenor defendant the State of Wyoming conversely argues that plaintiffs' "answer" to the 1999 Petition is imminent because of the instant rulemaking process. This is simply incorrect, as the 2003 Final Rule pertains only to Yellowstone National Park, Grand Teton National Park, and the John D. Rockefeller, Jr. Memorial Parkway, while the 1999 Petition seeks a snowmobile ban in over 30 National Park units.

ing delay snowmobiling—which is acknowledged by the NPS as "not in conformity with applicable legal requirements"—continues unabated, the Court finds that the agency's delay is unreasonable.

The Court does not, of course, take a position as to whether a favorable response to the Petition is warranted. However, while plaintiffs are not necessarily entitled to the answer they *want*, they are certainly entitled to *an* answer within a reasonable amount of time. *See Potomac Electric Power Co. v. ICC*, 702 F.2d 1026, 1034 (D.C.Cir.1983) ("[E]xcessive delay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate the potential effect of possible agency decisionmaking into future plans.").

*CONCLUSION*

Accordingly, for the reasons set forth herein, plaintiffs' motions for summary judgment must be granted in part and denied in part, and defendants' motion must be similarly granted in part and denied in part, and it is hereby

**ORDERED** that the March 25, 2003, Record of Decision; February 2003 Supplemental Environmental Impact Statement; and December 11, 2003, Final Rule are vacated and remanded to the National Park Service, U.S. Department of the Interior, for further proceedings not inconsistent with this Opinion; and it is

**FURTHER ORDERED** that, because the 2003 Final Rule is vacated and remanded, and pursuant to the Court's authority in *Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A.*, 705 F.2d 506, 553 (D.C.Cir.1983),[18] the prior January 22, 2001, Final Rule, as modified by the November 18, 2002, Final Rule, shall remain in effect until further Order of the Court; and it is

**FURTHER ORDERED** that the National Park Service shall respond to Bluewater Network's Rulemaking Petition by no later than February 17, 2004.

An appropriate Judgment accompanies this Memorandum Opinion.

**ORDER**

Pending before the Court are Defendant Intervenors International Snowmobile Manufacturers Association, Inc. ("ISMA") and Blueribbon Coalition's Emergency Motion for a Stay of Judgment and the Defendant Intervenor State of Wyoming's Motion for an Emergency Stay of Judgment. Upon careful consideration of the Emergency Motions, the responses and replies thereto, the entire record herein, as well as the governing statutory and case law, it is by the Court hereby **ORDERED** that the Emergency Motions for a Stay of Judgment are **DENIED.**

The Court is not persuaded that the factual and legal predicates for the extreme remedy of issuing a stay are met. *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir.1977). The Court finds that, for the reasons stated in the December 16, 2003, Memorandum Opinion, defendants are unable to demonstrate a likelihood of success on the merits, as the Court found clear violations of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"). The Intervenors have failed to present any new evidence to persuade the Court that its holding was in error. For this reason alone, the motion for a stay must be denied. *Blankenship v. Boyle*, 447 F.2d 1280

---

**18.** The Court notes that the NPS indicated in the 2003 Final Rule that, absent promulgation of the new regulations, the existing regulations would go into effect. 68 Fed.Reg. at 69,269.

(D.C.Cir.1971) (denying a motion for stay despite a showing of irreparable harm because there was no showing of a likelihood of success on the merits).

Moreover, the Court notes that the Intervenors cannot establish a showing of irreparable harm. *See Washington Metro. Area Transit Comm'n,* 559 F.2d 841. The Intervenors' claim that the Court's decision "will lead to chaos in the Three Parks because of its timing" is disingenuous at best. ISMA Intervenors' Mot. at 6. All defendants, including the Intervenors, originally argued extensively that the Court *should not* issue a decision *before* the Final Rule was published due to ripeness concerns; they now argue that a decision issued *a mere four days* after the publication of the Final Rule causes irreparable injury. Defendants cannot have it both ways. For reasons entirely beyond the Court's control, and entirely in the control of the Federal Defendants, who support the application for the stay, the Final Rule was not published until December 11, 2003, just six days before the Parks' winter season was to begin. For months prior to the challenged opinion, the Court repeatedly questioned the delay in implementing the Final Rule, and warned the parties that the delay raised serious concerns for the Court:

> (Judge Sullivan): Why has it taken so long for the government to issue a Final Ruling? The ROD has been out there for quite some time ... You recognize that legitimate arguments can be made by some that the government's intentionally delaying publication of a final rule to coincide with the opening of the winter season, do you not?

*See, e.g.,* Transcript of Motions Hearing (Morning Session) (Nov. 20, 2003)("Tr.") 5–7. Defendants assert that it is "suddenly completely unclear whose reservations will be honored ... and how admittance to the Park will be handled." ISMA Intervenors'

Mot. at 7–8. However, Federal Defendants *repeatedly* advised the Court that they were ready and able to implement the 2001 Winter Plan that defendants acknowledged would go into effect if the 2003 Rule was not implemented. *See, e.g.,* Hr'g Tr. at 7 (Federal Defendants' counsel stating that if the 2003 Final Rule did not go into effect, the parks would "operate under the 2001 Regulation ... the Park Service is ready with a backup ... they are prepared to operate under the fifty percent mandate."). The Court took the Federal Defendants at their word, and the Intervenors cannot claim surprise as a result of the Court's Order.

Moreover, any economic or emotional harm to those who made plans to visit the Park falls squarely on the defendants' shoulders. The Parks-run by the National Park Service ("NPS")-and snowmobile vendors chose to begin taking reservations and accepting potential visitors' money in July of 2003, on the assumption that the 2003 ROD would go into effect, despite the fact that a Final Rule *did not exist,* and despite the fact that the ISMA and the NPS were involved in ongoing litigation challenging the 2003 ROD. Press Release, Yellowstone National Park, Yellowstone Announces Snowmobile Reservation System for 2003–2004 Winter Season (July 10, 2003) (available at *http://www.nps.gov/yell/press/0348.htm* ) (announcing the start of the snowmobile reservation system for the 2003–04 season, indicating that advance reservations could be made as early as July 2003, and referring viewers to the Park's main web page for more information about "the implementation of the March 2003 Record of Decision."). If those making snowmobiling reservations and planning winter trips to the Parks "were not warned by [the NPS and the Intervenors] of the pending litigation," as well as the distinct possibility that the 2001 Final Rule requiring a snowmobile phase-out would remain in effect,

"their interests were not well served" by the defendants. *Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 738 (9th Cir.2001); *see also Lee v. Christian Coalition of Am., Inc.,* 160 F.Supp.2d 14, 33 (D.D.C.Cir.2001) ("The case law is well settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.")(internal quotations and alteration omitted).

Finally, to now grant the Intervenors' motions for a stay would be tantamount to the Court blinking reality at the promulgation of a final rule that is belied by the government's own evidence.